## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**UNITED STATES ex rel. JOHN T. O'NEILL, JR.,**

          **CIVIL ACTION**

**VERSUS**

          **NO. 18-567-JWD-RLB**

**GOPINATH GOPALAM, ET AL.**

## RULING AND ORDER

This matter comes before the Court on *Renewed Rule 12(b)(6) Motion to Dismiss* ("*Motion to Dismiss*"), (Doc. 63), filed by Defendants Gopinath Gopalam ("Gopalam") and Apollo Behavioral Health Hospital, LLC ("Apollo") (collectively, "Defendants"). Plaintiff-Relator John T. O'Neill, Jr. ("Relator") opposes the motion, (Doc. 65), and Defendants have filed a reply, (Doc. 66). Oral argument is not necessary. The Court has carefully considered the law, the allegations of the *First Amended Complaint and Jury Demand* ("*First Amended Complaint*"), (Doc. 55), and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Defendants' motion is granted in part and denied in part. Specifically, the motion is granted in that all claims are dismissed except Relator's retaliation claim. However, Relator will be given leave to amend to cure the deficiencies of the operative complaint.

### I. INTRODUCTION

#### A. Relevant Laws and Summary of Fraudulent Actions

"The False Claims Act, 31 U.S.C. § 3729 *et seq.*, 'imposes significant penalties on those who defraud the Government.' " *U.S. ex rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237, 240 (5th Cir. 2020) (quoting *Univ. Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 178 (2016)). "The Act is remedial, first passed at the behest of President Lincoln in 1863 to stem widespread fraud by private Union Army suppliers in Civil War defense contracts." *U.S. ex rel.*

*Grubbs v. Kanneganti*, 565 F.3d 180, 184 (5th Cir. 2009). "It is 'intended to protect the Treasury against the hungry and unscrupulous host that encompasses it on every side.' " *Id.* (quoting S. Rep. No. 99–345, at 11 (1986), 1986 U.S.C.A.N. 5266, 5276 (quoting *United States v. Griswold*, 24 F. 361, 366 (D. Or. 1885))). "To aid the rooting out of fraud, the Act provides for civil suits brought by both the Attorney General and by private persons, termed relators, who serve as a 'posse of *ad hoc* deputies to uncover and prosecute frauds against the government.' " *Id.* (quoting *U.S. ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 961 F.2d 46, 49 (4th Cir. 1992)). "In *qui tam*[1] suits brought by private persons on behalf of the Government the statute entitles the relator to between ten and thirty percent of any recovery made on behalf of the Government, depending on the extent of the relator's contribution to the action." *Id.* (citing 31 U.S.C. § 3730(d)).

"There are four elements of a False Claims Act claim." *Porter*, 810 F. App'x at 240. "Plaintiffs suing under the statute must show that (1) 'there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim).' " *Id.* (quoting *Abbott v. BP Expl. & Prod., Inc.*, 851 F.3d 384, 387 (5th Cir. 2017) (citing *U.S. ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009))).

Under the False Claims Act, a person is subject to liability if he, *inter alia*, (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"; (3) "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government";

---

[1] As the Fifth Circuit has explained, " 'Qui tam' is an abbreviation for *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which means 'who as well for the king as for himself sues in this matter.' " *Grubbs*, 565 F.3d at 184 n.5 (quoting *Black's Law Dictionary* 1262 (7th ed. 1999)).

and (4) "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government[.]"  31 U.S.C. § 3729(a)(1)(A), (B), (G).

Here, Relator is a former registered nurse for Apollo—an 18-bed inpatient psychiatric hospital and outpatient psychiatric services center. (*First Amend. Compl.* ¶¶ 8–9, Doc. 55.) Apollo's inpatient hospital and outpatient center are both located in Baton Rouge, Louisiana. (*Id.* at ¶ 9.) Relator brings claims against defendants Gopalam, Apollo, and Dr. Chandra M. Katta, M.D., ("Dr. Katta"), alleging that they violated the False Claims Act's provisions against Presenting False Claims for Payment, Use of False Statements, and Conspiring to Violate the False Claims Act (31 U.S.C. § 3729(a)(1)(A)–(C)) through carrying out a two-part scheme to defraud Medicare.[2] (*Id.* at ¶¶ 86–97.)  Additionally, Relator alleges that Gopalam and Apollo terminated his employment in violation of the False Claims Act's anti-retaliation provision (31 U.S.C. § 3730(h)). (*Id.* at ¶¶ 98–103.)

Relator alleges that Defendants violated the False Claims Act's provisions against Presenting False Claims for Payment, Use of False Statements, and Conspiring to Violate the False Claims Act (31 U.S.C. § 3729(a)(1)(A)–(C)) because they failed to comply with three healthcare laws. (*See id.* at ¶¶ 51, 73.) First, Defendants allegedly violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS"). (*Id.* at ¶¶ 73, 88–89, 96.) "The AKS is a criminal statute prohibiting the knowing or willful offering to pay, or soliciting, any remuneration to induce the referral of an individual for items or services that may be paid for by a federal health care program." *U.S. ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 893 (5th Cir. 2013) (per

---

[2] Since the present *Motion to Dismiss* is on behalf on defendants Gopalam and Apollo, Plaintiff's 31 U.S.C. § 3729(a)(1)(A)–(C) claims against Dr. Katta will not be addressed.

curiam) (citing 42 U.S.C. § 1320a–7b(b)(1–2); *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 901 (5th Cir. 1997)).[3]

The AKS contains a number of exceptions called "safe harbors." 42 U.S.C. § 1320a-7b(b)(3). For example, the AKS does not apply to "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services[.]" *Id.* § 1320a-7b(b)(3)(B). Some of these exceptions involve written contracts between organizations and individuals. *See id.* § 1320a-7b(b)(3).

Second, Defendants allegedly violated the Emergency Medical Treatment and Labor Act ("EMTALA"). (*First Amend. Compl.* ¶¶ 51, 56–57, 59, 64–79, Doc. 55.) "In 1986, Congress enacted the Emergency Medical Treatment & Labor Act (EMTALA) to ensure public access to emergency services regardless of ability to pay." Centers for Medicare and Medicaid Services,

---

[3] Specifically, the AKS generally makes it unlawful:

> [To] knowingly and willfully solicit[] or receive[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

42 U.S.C. § 1320a-7b(b)(1).  The AKS also makes it unlawful:

> [To] knowingly and willfully offer[] or pay[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

*Id.* § 1320a-7b(b)(2).

4

*Emergency    Medical    Treatment    &    Labor    Act    (EMTALA)*,    CMS.GOV, https://www.cms.gov/medicare/regulations-guidance/legislation/emergency-medical-treatment-labor-act (last visited Sept. 17, 2023). The Act provides:

> In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition . . . exists.

42 U.S.C. § 1395dd(a). Further, emergency departments that receive transfer patients cannot discriminate against patients based on their payor source:

> A participating hospital that has specialized capabilities or facilities (such as burn units, shock-trauma units, neonatal intensive care units, or (with respect to rural areas) regional referral centers as identified by the Secretary in regulation) shall not refuse to accept an appropriate transfer of an individual who requires such specialized capabilities or facilities if the hospital has the capacity to treat the individual.

42 U.S.C. § 1395dd(g).

Third, Defendants allegedly violated various Medicare laws and regulations. (*First Amend. Compl.* ¶¶ 51, 93, Doc. 55.) At the beginning of Relator's *First Amended Complaint*, Relator provides a "Statutory Background" section where he discusses various Medicare statutes and regulations. (*See id.* at ¶¶ 22–44). However, Relator does not specify in his *First Amended Complaint* which statutes and regulations Defendants allegedly violated. The Court has carefully reviewed these statutes and regulations, and although Relator never alleged which statutes and regulations were violated, the Court notes the language of 42 U.S.C. § 1395f(a)(2)(A), (a)(4), as such language is relevant to the second part of Defendant's alleged two-part scheme, discussed below:

(a) payment for services furnished an individual may be made only to providers of services which are eligible therefor under section 1395cc of this title and only if—

\*\*\*

(2)(A) in the case of inpatient psychiatric hospital services, such services are or were required to be given on an inpatient basis, by or under the supervision of a physician, for the psychiatric treatment of an individual; and (i) **such treatment can or could reasonably be expected to improve the condition for which such treatment is or was necessary** or (ii) **inpatient diagnostic study is or was medically required and such services are or were necessary for such purposes;**

\*\*\*

(4) in the case of inpatient psychiatric hospital services, **the services are those which the records of the hospital indicate were furnished to the individual during periods when he was receiving** (A) intensive treatment services, (B) admission and related services necessary for a diagnostic study, or (C) equivalent services;

42 U.S.C. § 1395f(a)(2)(A), (a)(4) (emphasis added). Likewise, the Court deems Relator's discussion of CMS1500 relevant. (*First Amend. Compl.* ¶ 37, Doc. 55.) When a provider submits a claim to Medicare, they do so by filling out a CMS1500 form, in which the provider certifies the following: "I certify that **the services listed above were medically indicated and necessary** to the health of this patient and were personally furnished by me or my employee under my personal direction." Centers for Medicare & Medicaid Services, CMS 1500 – Health Insurance Claim Form, *available at* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS1500.pdf (last accessed Sept. 17, 2023) (emphasis added).

### B.  Relevant Factual Background

The following factual allegations are primarily taken from Relator's *First Amended Complaint*, (Doc. 55). The well-pled allegations are assumed to be true for purposes of this motion. *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010) (citing *Doe v.*

*MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)). In sum, Relator alleges that Gopalam has devised a scheme to defraud Medicare in which he and others run Apollo as a "psych mill," akin to "pill mills." Likewise, Apollo retaliated against Relator for reporting this scheme.

### 1. *The Parties*

There are four parties involved in this matter. These parties include Relator, Apollo, Gopalam, and Dr. Katta.

Relator is a registered nurse who worked for Apollo in various nursing roles from November 2015 to January 2017. (*First Amend. Compl.* ¶ 8, Doc. 55.) These roles included nurse, PRN nurse, full-time nurse, interim Director of Nursing, and permanent Director of Nursing. (*Id.* at ¶ 74.) He was allegedly terminated in retaliation for reporting suspected fraudulent activity. (*Id.* at ¶ 8.) Relator is bringing this action on the Government's behalf pursuant to the False Claims Act's *qui tam* provisions. (*Id.* at ¶ 12.)

Defendant Apollo is an 18-bed inpatient psychiatric hospital in Baton Rouge, Louisiana, which also provides outpatient psychiatric services in both a Partial Hospitalization Program and Intensive Outpatient Program setting at a separate location in Baton Rouge. (*Id.* at ¶ 9.)

Defendant Gopalam is a business executive in the health care industry. (*Id.* at ¶ 10.) He currently serves as Apollo's Chief Executive Officer and sole manager and member. (*Id.*) Further, Gopalam holds degrees in engineering and computer science but does not have any medical training. (*Id.*)

Defendant Dr. Katta is Apollo's psychiatrist, seeing patients at both Apollo's inpatient and outpatient facilities. (*Id.* at ¶ 11.) While Dr. Katta is a sole practitioner affiliated with many hospitals, Dr. Katta lists Apollo's address as his "primary practice address in [Centers for Medicaid

and Medicare]'s NPI Registry." (*Id.*) Likewise, Dr. Katta has a Medicare provider agreement under NPI No. 1831131499. (*Id.*)

### 2. *Apollo's Two-Part Scheme to Defraud Medicare*

According to Relator's *First Amended Complaint*, Apollo utilizes a two-part scheme to defraud Medicare. (*Id.* at ¶ 55.) First, Apollo fraudulently packs its hospital with Medicare beneficiaries who have a sufficient number of in-patient psychiatric hospital days of Medicare benefits remaining. (*Id.* at ¶ 51, 55.) In doing so, Apollo denies patients with either no insurance coverage or insurance coverage with lower reimbursement than Medicare provides, such as Medicaid. (*Id.* at ¶ 51.) Thus, Apollo patients are admitted, treated, and discharged based on insurance coverage and ability to pay rather than medical need. (*Id.* at ¶ 54.) Relator argues that such practices are in violation of Medicare regulations and EMTALA. (*Id.* at ¶ 51.)

The second part of Apollo's alleged two-part scheme to defraud Medicare occurs after patients are admitted. (*Id.*) According to Relator, after admission, Apollo fraudulently extends Medicare patients' hospitalizations by providing false diagnoses (often bipolar disorder), which require medical services that are unnecessary or never provided. (*Id.* at ¶ 70.) Likewise, Apollo provides false information in relation to patients' prognoses and progress. (*Id.*) Relator claims that Dr. Katta and Apollo do so while also "falsely certifying to the government that they were in compliance with all Medicare laws and regulations[;] that the bills were true, accurate and complete[;] and that the services were medically necessary and complete." (*Id.*) Thus, as Relator asserts, Apollo and its psychiatrist have violated Medicare regulations, the False Claims Act, and the AKS. (*Id.* at ¶¶ 20, 73.) More specifically, Relator's allegation states:

> These fraudulent acts and omissions are both factually and legally false under the False Claims Act. They are factually false because Apollo and its psychiatrist bill Medicare for services that are not medically necessary and/or not actually provided. They are legally false because Apollo and Dr. Katta falsely certify to the

8

government that they are in compliance with all Medicare laws and regulations, that their bills are true, accurate and complete, and that the services were medically necessary and complete. In addition, Apollo also violates the AKS by paying remuneration to Dr. Katta, in the form of referring a large number of Medicare patients to him, in order to induce Dr. Katta to go along with Apollo's fraudulent scheme by falsely extending the hospitalization of Medicare patients at Apollo and certifying Apollo's admissions, treatment, and discharge of its patients.

(*Id.* at ¶¶ 53, 73.) Specific allegations relating to Apollo's two-step scheme are discussed below.

### a.   Practices for Admitting and "Dumping" Patients

Relator alleges that Apollo's priority for admitting patients is as follows: (1) "Medicare beneficiaries having benefits remaining (i.e., with inpatient days remaining on their current illness and still within their 190 lifetime reserve days)"; (2) patients with private insurance; (3) patients with Medicaid; (4) "[p]atients with no insurance or those with Medicare or private insurance benefits that have exhausted their coverage . . . ." (*Id.* at ¶ 54.) Gopalam would instruct Apollo staff on when to discharge patients pursuant to their ability to pay. (*Id.* at ¶ 69.) Further, Gopalam and Rhonda Zucco, Apollo's Vice President of Business Development, (*see id.* at ¶ 50), had daily meetings at 8:30 a.m. about discharge. (*Id.* at ¶ 69.) "As a result, the average length of stay for a Medicare patient is 8 days versus commercial insurance and Medicaid patients, which is 5 days, and self pay and non-funded patients, which is 2-3 days." (*Id.* at ¶ 68.)

Relator pleads that Apollo will fraudulently extend Medicare patients' stays because those stays generate more money. (*Id.*) However, if a Medicare patient's coverage was nearing its end, Gopalam, on multiple occasions, would instruct Apollo's staff to exhaust the patient's remaining coverage, without regard for medical necessity. (*Id.* at ¶ 52.) Once coverage runs out, regardless of whether that coverage was with Medicare, Medicaid, self-pay, or unfunded, those patients are "summarily dumped as a matter of routine . . . ." (*Id.*) Relator recalls such happening to a suicide risk patient. (*Id.*) Shortly after being "dumped" from Apollo, that patient took his or her life. (*Id.*)

Thus, as Relator alleges, Apollo profits off wasting its patient's 190 Medicare inpatient days, thus "exploiting some of the most vulnerable members of our society . . . ." (*Id.*)

b.  <u>Maximizing Medicare Patients with Benefits</u>

To shed light on how Apollo fraudulently maximizes its Medicare patients with benefits, Relator provides background in his *First Amended Complaint* on how patients are referred to Apollo. (*Id.* at ¶ 56.)  He pleads that patients in need of mental health care will, in the vast majority of cases, first seek care from a general hospital's emergency room. (*Id.*) Under EMTALA, a hospital's emergency department must stabilize and examine the patient, regardless of the patient's ability to pay. (*Id.*) Under Louisiana law, if after examination a physician determines that the patient (1) suffers from either a substance abuse or mental health disorder and (2) is gravely disabled, a danger to him or herself, or a danger to others, the physician may issue a Physician Emergency Certificate ("PEC"). (*Id.* (citing La. R.S. § 28:53).) If a PEC is issued, a patient is involuntarily detained at a psychiatric hospital for up to 72 hours until the parish coroner can do a second examination of the patient. (*Id.* (citing La. R.S. § 28:53).)

Relator alleges that "[t]he vast majority of patients admitted at Apollo are transferred from hospitals' emergency departments, usually, but not always under a PEC." (*Id.* at ¶ 57 (footnote omitted).)  He pleads that

> [u]nder EMTALA, as long as there is at least one empty bed and the hospital is able to provide treatment that is medically necessary and expected to improve the patient's condition, Apollo is required to admit the patient without regard to insurance coverage or ability to pay. In fact, they cannot . . . ask the transferring hospital about it or run the patient through their insurance verification system.

(*Id.*) However, Apollo does not follow this practice and, thus, is in violation of Medicare regulations. (*Id.* at ¶ 57–58.)

Relator alleges that under EMTALA, Dr. Katta should be admitting these patients based on "whether treatment is medically necessary and expected to improve the patient's condition." (*Id.* at ¶ 58.) Instead, Gopalam and Zucco decide what patients to admit either directly or through policies and procedures promulgated by them. (*Id.*) These policies and procedures include determining whether a patient has insurance before admission and if they have insurance, whether they have remaining benefits that Apollo would gain reimbursement from. (*Id.* at ¶ 59.)

c.  Policies and Procedures for Maximizing Medicare Patients with

Benefits

In violation of both Medicare regulations and EMTALA, "Apollo routinely and systematically runs patients through its MVP insurance verification system before deciding whether to admit the patient[,]" and "Gopalam requires the intake staff to call him after hours to personally approve all admission after a patient's insurance coverage has been run." (*Id.*) Thus, patients with no insurance, insurance but no remaining coverage, or Medicaid, are denied admission the vast majority of the time, except, for example, in the rare instance that Apollo has a large number of open beds. (*Id.* at ¶ 60.) Relator asserts that such a practice is intended to lessen the extent of private insurance while maximizing the number of Medicare patients with remaining benefits. (*Id.*)

In Relator's *First Amended Complaint*, he claims that "Gopalam and Zucco routinely expressed these policies and procedures to staff during meetings and also in personal interactions if an intake nurse mistakenly admitted patients with no coverage or more Medicaid patients than Gopalam and Zucco desired." (*Id.* at ¶ 61.) Likewise, Relator provides a July 27, 2016, memorandum written by Zucco in which Relator alleges that Zucco memorialized this illegal admissions practice. (*See id.*) In the memorandum, Zucco relayed to intake staff:

11

> The following are from past memos but needs to be re-addressed[,] so please sign as acknowledgement and place in my mailbox.
>
> ***
>
> 3) Medicare:
> Check "Lifetime Psychiatric Days", Part A hospital full days, and co-insurance days. Need all three. Melissa S did not have hospital days or co-insurance days.

(*Id.*)

He further asserts that Apollo and Gopalam made several efforts to conceal their EMTALA and Medicare violations, given that Centers for Medicaid and Medicare ("CMS") routinely conducts site inspections. (*Id.* at ¶ 63.) These efforts included devising "a secret coding system in which a patient's payer source would be reflected upon admission." (*Id.*) Relator provides an example of this coding system in his *First Amended Complaint*. (*See id.*) In an email from Gopalam to Zucco, Gopalam explains that Medicare patients should be coded as "MC," Medicare patients with no days left should be coded as "MC0," patients with both Medicare and Medicaid should be coded as "MC/MD," and patients with both Medicare and Medicaid but with no remaining Medicare benefits should be coded as "MC0/MD." (*Id.* at ¶ 64.)

### d.  Apollo's Falsification and Destruction of Medical Records

Additionally, alleges Relator, Apollo falsifies and destroys medical records in attempts to conceal its illegal admissions practices. (*Id.* at ¶ 65.) Under Medicare and EMTALA, both the transferring and receiving hospital must maintain a patient's medical records for at least five years. (*Id.*) Relator claims that for unwanted patients, Apollo would make false statements on its standard intake form as to why the patient would not be admitted. (*Id.*) Such false statements would include: (1) that there were no available beds; (2) that a patient was violent; or (3) that the patient needed treatment for drug abuse. (*Id.*) More specifically, the intake nurses would receive

the referral documents from the transferring hospital via fax, run the patient through the MVP insurance verification system, and if the patient had no coverage, the intake nurse would staple an intake form (sometimes with a false reason for not admitting the patient and sometimes with the reason blank) to the stack of intake medical records and place the entire packet into a secure shred bin serviced by Iron Mountain, thereby destroying the records that they are required to maintain under Medicare regulations and EMTALA.

(*Id.* at ¶ 66.) Prior to termination, Relator made copies of these intake packets before Apollo allegedly destroyed them. (*Id.*) Relator contends that when compared to Apollo's and the transferring hospitals' medical records, these documents "confirm that . . . Apollo refused to admit patients in violation of Medicare regulations and EMTALA." (*Id.*)

Relator also claims that Zucco kept a Word document titled "DNR," an abbreviation for "do not return." (*Id.* at ¶ 67.) On this list would be the names of patients who had no insurance coverage or who exhausted their 190 day lifetime reserve days under Medicare. (*Id.*) Relator alleges that Zucco instructed him to change the name of this document form "DNR" to "VIP" in attempts to avoid detection from CMS inspectors. (*Id.*) Likewise, Relator pleads that he has an email from Zucco instructing him to change the name of the Word document, and Relator still has a copy of this list. (*Id.*)

### 3. *Apollo's Retaliation Against Relator*

As Relator rose to higher positions in Apollo's nursing department, he became aware of Apollo's alleged fraudulent practices. (*Id.* at ¶ 75.) On numerous occasions, Relator reported these practices to Gopalam and Zucco and was told that such illegal practices would cease. (*Id.*) Such practices did not stop, and Relator submitted a letter of resignation to Gopalam on August 10, 2016, referencing his concerns about Apollo's fraudulent activity and fear of losing his nursing license. (*Id.* at ¶ 76.) Gopalam verbally reassured Relator that the alleged fraudulent practices would cease and offered him a $20,000 raise, which Relator accepted. (*Id.*)

Relator continued to complain about the fraudulent practices that continued to occur. On January 20, 2017, Apollo terminated Relator without warning and he was asked to sign a nondisclosure agreement in exchange for a severance payment, to which he refused. (*Id.* at ¶ 77.) Apollo, through one of its nurses, filed an ethics complaint against Relator in attempts to have his nursing license revoked (*Id.*) Specifically, "Gopalam threatened an Apollo nurse . . . that she would be fired unless she submitted . . . [a] complaint to the Louisiana State Board of Nursing with allegations supplied by Gopalam[.]" (*Id.*) While employed with Apollo, Relator had never received any disciplinary action. (*Id.* at ¶ 74.)

Relator asserts that the ethics claims are false and have caused him damage. (*Id.* at ¶ 78.) Due to the false and defamatory complaint, Relator was unable to secure other employment in Louisiana and consequently had to move to Texas to continue his nursing career. (*Id.* at ¶ 79.) Likewise, "[i]n order to respond to [the] complaint, Relator was required to repeat and spread these false allegations to third parties to demonstrate their falsity and obtain countless character letters attesting to [his] character." (*Id.* at ¶ 78.) To date, the complaint has not been ruled on by the Board of Nursing. (*Id.*)

### 4. *Other Violations*

Relator alleges that Apollo violated various Medicare conditions of participation. (*Id.* at ¶¶ 80–85.) The following violations, claims Relator, "render Apollo's services of such low quality that they are virtually worthless, thereby also violating the FCA." (*Id.* at ¶ 85.)

First, Relator pleads that Apollo lacks an effective governing body to be held legally responsible for the acts of the hospital. (*Id.* at ¶ 80.) Likewise, Apollo lacks a qualified staff due to Gopalam and Apollo underpaying employees. (*Id.* at ¶ 81.) An under qualified staff and deficient training procedures has led to violations of Medicare regulations. (*Id.*)

In addition to staffing issues, Apollo does not adequately communicate its grievance process to patients and often ignores the process altogether. (*Id.* at ¶ 82.) Instead, Apollo staff has harassed, abused, and assaulted patients. (*Id.*) Relator recalls in his *First Amended Complaint* a time where he attempted to fire two techs who had punched a patient in the face, but Gopalam would not fire the employees because replacement would require higher wages. (*Id.*) Apollo also violates the regulations intended to minimize seclusion and restraint through calling the police to detain and/or arrest patients. (*Id.*)

Relator also claims that Apollo supplies its patients with "woefully insufficient" dietary services. (*Id.* at ¶ 83.) For example, Apollo does not spend adequate funds on patients' food and beverages, often resulting in meals being unidentifiable and inedible and snacks and beverages being rationed. (*Id.*) Further, while Apollo's facility is in standard physical condition, its patients' rooms are infested with bed bugs, and Gopalam will not spend money to terminate the infestation. (*Id.* at ¶ 84.) Likewise, hospital staff does not routinely wash their hands or take any other efforts to stop the spread of diseases or infections. (*Id.*)

### 5. *Causes of Action and Prayer for Relief*

First, Relator seeks relief under the False Claims Act pursuant to 31 U.S.C. § 3729(a)(1)(A) for fraudulently presenting false claims for payment. (*Id.* at ¶ 87.) Relator alleges that by "creating false and/or misleading medical records, Defendants submitted payment to Government Programs that contained false and fraudulent statements." (*Id.* at ¶ 88.) Further, such bills were "knowingly false and fraudulent," in violation of the AKS. (*Id.*) "As a result of the practices of Defendants, including upcoding and unnecessarily admitting patients to the hospital, Defendants regularly submitted bills to Government Programs for services that were either not accurate, not provided,

or unnecessary in violation of the federal AKS . . . ." (*Id.* at ¶ 89.) Likewise, Defendants presented false or fraudulent claims for payment or approval knowingly. (*Id.* at ¶ 90.)

Next, Relator seeks relief under the False Claims Act pursuant to 31 U.S.C. § 3729(a)(1)(B) for the use of fraudulent statements. (*Id.* at ¶ 92.) Relator alleges that Apollo prolongs the stays of Medicare patients, routinely makes up false diagnoses for patients (a preferred diagnosis being bipolar disorder) that require medical services that are either unnecessary or not actually provided, and provides false information regarding patients' prognoses and progress. (*Id.* at ¶ 93.) "Defendants bill Medicare for all of these fraudulent, unnecessary services and inpatient days while falsely certifying to the government that they were in compliance with all Medicare laws and regulations, that the bills were true, accurate and complete, and that the services were medically necessary and complete." (*Id.*)

Relator also seeks relief under the False Claims Act pursuant to 31 U.S.C. § 3729(a)(1)(C) for conspiracy to violate the False Claims Act, specifically 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1)(B). (*Id.* at ¶ 95, 97.) "Defendants conspired to create medical records with false and misleading information in violation of the AKS, thereby seeking reimbursement for medical services that were not eligible for any reimbursement or for the reimbursement sought." (*Id.* at ¶ 96.)

Lastly, Relator seeks relief under the False Claims Act pursuant to 31 U.S.C. § 3730(h)(1) for retaliation. (*Id.* at ¶ 99.) Relator alleges that he "engaged in protected activity by orally reporting the suspected violations to Gopalam and Zucco on numerous occasions and was generally told that Apollo would stop the illegal practices." (*Id.* at ¶ 100.) Therefore, Defendants had knowledge of the illegal activity that Relator complained of, but Defendants continued the activity. (*Id.* at ¶ 101.) Defendants retaliated against Relator through firing him and filing a false

and defamatory ethics complaint with the Louisiana State Board of Nursing, which prevented him from gaining other nursing employment in hospitals in the area. (*Id.* at ¶ 102.)

In his Prayer for Relief, Relator seeks a judgment against Defendants for "treble the Government's damages in an amount determined at trial, plus the maximum statutorily-allowed penalty for each false claim submitted in violation of the [False Claims Act]." (*Id.* at 36.) Likewise, Relator prays for any administrative civil penalties associated with violating EMTALA, the AKS, and Medicare statutes and regulations, "as well as an assessment of not more than three times the amount of remuneration offered, paid, solicited or received, without regard to whether a portion of that amount was offered, paid or received for a lawful purpose." (*Id.*) Additionally, Relator seeks the maximum Relator award under EMTALA, the False Claims Act, and Medicare statutes and regulations, as well as costs. (*Id.* at 37.) Lastly, Relator seeks any further relief that is deemed proper. (*Id.*)

### C.  Relevant Procedural Background

Relator filed his *qui tam* complaint on May 21, 2018. (Doc. 1.) The United States filed a notice on April 25, 2022, declining to intervene in the action. (Doc. 33.) "Following the unsealing of the Complaint, the Defendants were served on July 11, 2022." (*Memo in Support*, Doc. 63-1 at 1.) On August 22, 2022, Defendants filed a motion to dismiss Relator's *qui tam* complaint. (Doc. 46.) However, on September 27, 2022, Relator, without leave of court, filed his *First Amended Complaint*, (Doc. 55), and an opposition to Defendants' original motion to dismiss, (Doc. 56). This Court then denied Defendants' original motion to dismiss, (Doc. 46), without prejudice, subject to renewal of arguments if appropriate. (Doc. 59). Thereafter, Defendants filed the present *Motion to Dismiss*, (Doc. 63), seeking dismissal of Relator's *First Amended Complaint*.

## II.    RELEVANT STANDARDS

### A.  Rule 12(b)(6) Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Hamilton v. Dall. Cnty.*, No. 21-10133, 2023 WL 5316716, at *3 (5th Cir. Aug. 18, 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

"To be plausible, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.' " *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010) (quoting *Twombly*, 550 U.S. at 555). "In deciding whether the complaint states a valid claim for relief, we accept all well-pleaded facts as true and construe the complaint in the light most favorable to the plaintiff." *Id.* (citing *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)). The Court does "not accept as true 'conclusory allegations, unwarranted factual inferences, or legal conclusions.' " *Id.* (quoting *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007)). "A claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.' " *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (citing *Iqbal*, 556 U.S. at 679).

The Court's "task, then, is 'to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success.' " *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (quoting *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir.2010) (citing

*Iqbal*, 556 U.S. at 678)).   "[A] claim is plausible if it is supported by 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct].' " *Calhoun v. City of Hous. Police Dep't*, 855 F. App'x 917, 919–20 (5th Cir. 2021) (per curiam) (quoting *Twombly*, 550 U.S. at 556).

Additionally, "[i]n determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the court addresses its inquiry is limited to (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019) (citations omitted).   "Although a 'court may also consider documents attached to either a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claims,' . . . the court need not do so." *Brackens v. Stericycle, Inc.*, 829 F. App'x 17, 23 (5th Cir. 2020) (per curiam) (quoting *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014)).   *See also Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) ("using permissive language regarding a court's ability to rely on documents incorporated into the complaint by reference").

### B.  The False Claims Act and Rule 9(b) Standard

"The False Claims Act is a potent remedial statute. As a counterweight to the statute's power and as a shield against fishing expeditions, FCA suits are subject to the screening function of Federal Rule of Civil Procedure 9(b)." *U.S. ex rel. Gage v. Davis S.R. Aviation, L.L.C.*, 623 F. App'x 622, 623 (5th Cir. 2015); *see also id.* at 625 ("An FCA complaint must meet the heightened pleading standard of Rule 9(b).").   Under this Rule, "[t]o allege fraud, 'a party must state with particularity the circumstances constituting fraud.' " *Id.* at 625 (quoting Fed. R. Civ. P. 9(b)).

" 'Rule 9(b) requires, at a minimum, that a plaintiff set forth the "who, what, when, where, and how" of the alleged fraud.' " *Id*. (quoting *U.S. ex rel. Steury v. Cardinal Health, Inc*., 625 F.3d 262, 266 (5th Cir. 2010)); *see also U.S. ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 329 (5th Cir.2003) ("The time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby must be stated . . . in order to satisfy Rule 9(b)." (internal quotation marks and citation omitted)).

The Fifth Circuit " 'appl[ies] Rule 9(b) to fraud complaints with bite and without apology.' " *U.S. ex rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237, 240 (5th Cir. 2020) (quoting *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009)). But, as will be explored below,

> "to plead with particularity the circumstances constituting fraud for a False Claims Act [§ 3729(a)(1)(A)] claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."

*Id.* (quoting *Grubbs,* 565 F.3d at 190).

## III.    DISCUSSION

In sum, the Court will grant Defendants' *Motion to Dismiss* in part and deny in part. The Court will deny Defendant's motion with respect to Relator's retaliation claim but will grant the motion with respect to Relator's 31 U.S.C. § 3729(a)(1)(A)–(C) claims. Regarding Relator's 31 U.S.C. § 3729(a)(1)(A) claim, Relator fails to plead presentment with particularity under Rule 9(b). Likewise, he fails to plead his 31 U.S.C. § 3729(a)(1)(B) claim with particularity regarding the statute's falsity element. Since Relator fails to plead adequate claims under 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1)(B), Relator's conspiracy claim under 31 U.S.C.

§ 3729(a)(1)(C) inherently fails as well, as liability under 31 U.S.C. § 3729(a)(1)(C) is dependent upon liability under 31 U.S.C. § 3729(a)(1)(A) or 31 U.S.C. § 3729(a)(1)(B).

### A. 31 U.S.C. § 3729(a)(1)(A) Claim

#### 1. *Parties' Arguments*

##### a. Defendants' Memo in Support (Doc. 63-1)

In their *Memorandum in Support of Renewed Rule 12(b)(6) Motion to Dismiss* ("*Memo in Support*"), (Doc. 63-1), Defendants argue that Relator's First Amended Complaint must be dismissed for two reasons and reasserts the arguments made in their original motion to dismiss, (Doc. 46). (*Memo in Support*, Doc. 63-1 at 1.) First, "Relator failed to plead allegations upon which a claim for relief can be granted." (*Id.*) Second, "Relator failed to plead the claims asserted . . . with particularity as required by Fed.R.Civ.P.9(b)." (*Id.*)

Defendants assert that Relator's *First Amended Complaint* fails to meet Rule 9(b)'s particularity requirement because he fails to identify "the date, time, place, or service of any allegedly false or fraudulent claim." (*Id.* at 6–7 (emphasis omitted).) In particular, "Relator's 100+ paragraph Amended Complaint does not include a single allegation regarding a specific patient, false record, claim, or billing date to support his FCA claims." (*Id.* at 8.) Likewise, Relator did not provide adequate facts to support "his claims that: (1) patients were admitted, retained, and/or discharged without regard to medical necessity; (2) the Defendants falsified medical diagnoses; (3) the Defendants violated [the] AKS[;] or (4) the conditions of the staffing and facility fell below federal standards." (*Id.*)

Defendants assert that to plead a viable claim under 31 U.S.C. § 3729(a)(1)(A), Relator must meet three elements: (1) the presentment of a claim; (2) the claim is false or fraudulent; (3) knowledge that the claim presented was false or fraudulent. (*Id.* at 10.)

i.   <u>Presentment</u>

To support their argument that Relator has not adequately alleged the presentment of a claim, Defendants first contend that "any allegations regarding unadmitted patients, refusal of patient transfers, or patient discharges cannot support a FCA claim [because] . . . no claims for payment would have been submitted for those patients." (*Id.* (emphasis omitted).) Further, Relator's following allegations are too general and are entirely conclusory to satisfy the specificity requirement for pleading presentment of a claim:

> "[A]s a result of the practices among the Defendants creating false and/or misleading medical records, Defendants submitted payments to Government Programs that contained false and fraudulent statements.[""] (Amended Complaint, ¶ 88.)

> "[A]s a result of the practices of Defendants, including upcoding and unnecessarily admitting patients to the hospital, Defendants regularly submitted bills to Government Programs for services that were either not accurate, not provided or unnecessary in violation of the federal AKS." (Amended Complaint, ¶ 89.)

(*Id.*) Defendants note that these allegations in the *First Amended Complaint* nor others identify a knowingly false claim that was presented to Medicare or Medicaid for payment by date, time, place, or service provided. (*Id.* at 11.)

To support their proposition, Defendants point to *Grubbs* and explain how the Fifth Circuit has found that " 'if [a plaintiff] cannot allege the details of an actually submitted false claim . . . [the claim] may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.' " (*Id.* (quoting *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).) Defendants explain how the Fifth Circuit has clarified *Grubbs*, in that the case " ' does not absolve [a relator] of the burden of otherwise sufficiently pleading the time, place, or identity details of the traditional standard, in order to effectuate Rule 9(b)'s function of fair notice and protection from frivolous suits.' " (*Id.* (quoting *U.S. ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x

890, 895 (5th Cir. 2013)) (emphasis omitted).) Thus, "[w]here a 'Relator's pleadings contain sweepingly conclusory allegations that are devoid of factual details,' dismissal under Rule 9(b) is proper." (*Id.* at 11–12 (quoting *U.S. ex rel. Guth v. Roedel Parsons Koch Blache Blahoff & McCollister*, No. 13-600, 2014 WL 7274913, at *6 (E.D. La. Dec 18, 2014), *aff'd*, 626 F. App'x 528 (5th Cir. 2015)) (emphasis omitted).) Therefore, argue Defendants, since Relator did not specify details about his claims, he has failed to plead "presentment" with particularity because the only allegations in Relator's *First Amended Complaint* are "sweepingly conclusory allegations" of presentment. (*Id.* at 12 (internal quotations omitted).)

Defendants also argue that Relator's *First Amended Complaint* fails with respect to his allegations regarding Medicare. (*Id.* at 6.) While Relator "bases many of his claims on purported violations of Medicare regulations by failing to admit or retain uninsured or underinsured patients," Relator fails to specify which Medicare regulations Defendants violated. (*Id.*) Further, Defendants argue that Relator's claims that Defendants violated EMTALA by refusing to admit uninsured patients are legally unsupported. (*Id.*) First, EMTALA does not apply to Apollo. (*Id.*) Rather, "EMTALA applies only to the treatment and stabilization of an emergency medical condition in an emergency room setting . . . ." (*Id.*) It "does not require any facility to admit a patient for treatment that is medically necessary and expected to improve the patient's condition." (*Id.* at 20 (internal citations omitted).) Relator does not address if Apollo had the resources to handle emergency claims or even did so. (*Id.*) Likewise,

> Relator failed to allege facts sufficient to show that EMTALA applied to Apollo or to any of the patients referred to Apollo, or that Apollo otherwise illegally turned away patients based on their lack of insurance coverage. And Relator failed to allege any instance of a transfer of a patient with an unstabilized medical condition that would satisfy Rule 9(b)'s specificity requirement.

(*Id.*)

23

Second, even if EMTALA applies to Apollo, Fifth Circuit precedent provides that a False Claims Act claim cannot be based on unassessed fines for violations of federal statutes and regulations. (*Id.* at 6.) The appropriate remedy for an EMTALA violation is a state law claim by the individual patient or an administrative remedy. (*Id.* at 20.) To support the argument that EMTALA does not create an individual federal cause of action for regulatory damages under the False Claims Act, Defendants cite the Fifth Circuit's decision in *United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*:

> [U]nassessed regulatory penalties are not obligations under the FCA. For FCA liability to attach, there must be an "established" duty "to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). Where, as in this case, a regulatory penalty has not been assessed and the government has initiated no proceeding to assess it, there is no established duty to pay. . . . [M]ost regulatory statutes . . . impose only a duty to obey the law, and the duty to pay regulatory penalties is not "established" until the penalties are assessed.

(*Id.* at 21 (citing *U.S. ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1039–40 (5th Cir. 2016)).)

### ii.   Falsity

Defendants then go on to address the second element of whether the presented claim is false or fraudulent. (*Id.* at 12.) Defendants assert that although unclear, Defendants assume that Relator is asserting a false certification claim through alleging that the Medicaid and Medicare bills that Defendants submitted were fraudulent because Apollo failed to comply with Medicare's conditions of participation or all federal laws. (*Id.*) Likewise, Defendants falsely certified that they were in compliance with the AKS because they had a referral and kickback scheme with Dr. Katta. (*Id.*) Defendants argue that in relation to this element, Relator's *First Amended Complaint* fails on two grounds: (1) "the Amended Complaint lacks allegations sufficient to utilize a 'false

certification' theory"; and (2) "Relator fails to allege an adequate basis for false and fraudulent claims based on an alleged kickback scheme." (*Id.*)

In regard to Defendants' argument that Relator's *First Amended Complaint* falls short of pleading false certification, Defendants rely on *Thompson v. LifePoint Hospitals Inc.* for the proposition that "[t]he Fifth Circuit has repeatedly held that a relator [cannot] maintain a FCA case unless: (1) the provider was required to file a certification in connection with the claim; (2) the filed certification was false[;] and (3) relator identified specific claims and/or certifications that were fraudulent." (*Id.* at 13 (quoting *Thompson v. LifePoint Hosps., Inc.*, No. 11-1771, 2013 WL 5970640, at *3 (W.D. La. Nov. 8, 2013)) (emphasis omitted).) Defendants contend that the *First Amended Complaint* only generally states that Defendants violated Medicare statutes and regulations. (*Id.* (citing *First Amend. Compl.* ¶¶ 22–44, Doc. 55).) "The Amended Complaint generally asserts that '[t]o receive Part A and Part B payments, sponsors, as well as their authorized agents, employees, and contractors, are required to comply with all applicable federal laws, regulations, and CMS instructions.' " (*Id.*) Merely alleging a general duty of compliance will not suffice for a False Claims Act false presentment claim. (*Id.*) As the Fifth Circuit has explained,

> [F]alse certifications of compliance create liability under the [False Claims Act] when certification is a prerequisite to obtaining a government benefit. Thus, where the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation.

(*Id.* at 12 (quoting *U.S. ex rel. Thompson v. Columbia/HCA Helathcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997) (internal quotations omitted).) Therefore, Relator's factual allegations must pertain to which certification was made, when it was made, who made it, and what it entailed. (*Id.* at 14.) Likewise, "Relator must identify a specific claim for payment that was made with a specific

certification that is alleged to be false." (*Id.*) Such is not present in the *First Amended Complaint*. (*Id.*)

Further, Relator does not adequately allege fraud under the AKS. (*Id.*) Defendants assert that "The AKS prohibits offering money or other things of value to entice another party to provide a good or service that would be paid for by a federal health care program." (*Id.* (quoting *U.S. ex rel. King v. Solvay Pharm., Inc.*, 871 F.3d 318, 331 (5th Cir. 2017) (citing 42 U.S.C. § 1320a–7b(b)(2)(A))).) Likewise, the statute prohibits "(1) the solicitation or receipt of remuneration in return for referrals of Medicare patients[;] and (2) the offer or payment of remuneration to induce such referrals." (*Id.* (quoting *Thompson*, 125 F.3d at 901).) Since the AKS is part of the False Claims Act, it is also subject to Rule 9(b)'s particularity requirement. (*Id.* (quoting *LifePoint Hosps., Inc.*, 2013 WL 5970640, at *5).)

Defendants cite to *Nunnally*, asserting that to survive 9(b)'s particularity requirement, Relator must plead specific details about actual referrals made by a physician that entered into an agreement with a health care facility. (*Id.* at 15 (quoting *Nunnally*, 519 F. App'x at 897).) In *Nunnally*, the Fifth Circuit found that allegations of a hospital "violat[ing] the AKS by inducing physicians to provide improper referrals for lab services" were "sweeping and conclusory allegations of 'verbal agreements' between [the hospital] and 'various physicians,' without a shred of detail or particularity." (*Id.* at 14 (quoting *Nunnally*, 519 F. App'x at 897) (alterations in original).) Likewise, "actual inducement is an element of the AKS, and [the relator] must provide reliable indicia that there was a kickback provided in turn for a referral of patients." (*Id.* at 15 (quoting *Nunnally*, 519 F. App'x at 897) (second alteration in original) (internal citations omitted).)

Defendants then point to Relator's allegation that

> Apollo also violates the AKS by paying remuneration to Dr. Katta, in the form of referring a large number of Medicare patients to him, in order to induce Dr. Katta to go along with Apollo's fraudulent scheme by falsely extending the hospitalization of Medicare patients at Apollo and certifying Apollo's admissions, treatments, and discharge of its patients.

(*Id.* (quoting *First Amended Complaint* ¶ 53, Doc. 55).) Defendants contend that such allegations are ones the Fifth Circuit specifically rejected in *Nunnally*. (*Id.*) Therefore, Relator has failed to meet Rule 9(b)'s particularity requirement and, thus, has not adequately pled the False Claims Act's falsity requirement for a presentment claim. (*Id.*)

### iii.    Knowledge

Defendants assert that to pass 31 U.S.C. § 3729(a)(1)(A)'s knowledge requirement, a person either "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; . . . ." (*Id.* at 15–16 (citing 31 U.S.C. § 3729(b)(1)(A)).) Relator alleges that Apollo's acts and omissions were "false because Apollo and its psychiatrist bill Medicare for services that are not medically necessary and/or not actually provided." (*Id.* at 16 (quoting *First Amended Complaint* ¶ 53, Doc. 55).) Defendants contend that such an allegation is not particular enough to survive Rule 9(b)'s heightened standard because (1) "Relator does not allege how the treatment of patients who were diagnosed and referred from emergency departments was medically unnecessary"; (2) "there is not one specific example of a patient on which Dr. Katta or Apollo knowingly made or accepted a false, medically unnecessary diagnosis"; and (3) "[t]here is not one specific example of a patient on which Apollo or Dr. Katta billed for services not actually provided." (*Id.*)

b.  Relator's Opposition (Doc. 65)

In his *Opposition in Response to Defendants' Renewed Motion to Dismiss* ("*Opposition*"), Relator contends that as an express condition of payment, federal law requires that medical services, including inpatient psychological services, actually be provided to receive CMS/Medicare's payments. (*Opposition*, Doc. 65 at 6 (citations omitted).) Relator argues, therefore, that it is indisputable that billing for medical services not rendered runs afoul of 31 U.S.C. § 3729(a)(1)(B). (*Id.* (citations omitted).) Likewise, as an express condition of payment, federal law requires that medical services, including inpatient psychological services, be medically necessary, and the Fifth has held that "claims for medically unnecessary treatment are actionable under the [False Claims Act]." (*Id.* at 7–8 (citing *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004)).)

Relator asserts that his *First Amended Complaint* established that Defendants had a multi-faceted scheme to defraud Medicare in violation of the False Claims Act. (*Id.* at 9.) This scheme included: (1) strategically packing its hospital with preferred Medicare beneficiaries to the exclusions of other patients; (2) fraudulently extending preferred Medicare beneficiaries' stays at the hospital; (3) billing Medicare for these fraudulent activities while ensuring that they were in compliance with Medicare laws and regulations; and (4) "dumping" patients once their Medicare coverage had exhausted. (*Id.* at 9–10.)

In citing *Grubbs*, Relator asserts that to succeed in his 31 U.S.C. § 3729(a)(1)(A) claim, he need only allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." (*Id.* at 14 (citing *Grubbs*, 565 F.3d at 190).) Likewise, "the complaint need not specifically allege details regarding presentment

28

or 'of fraudulent bills actually presented to the government.' " (*Id.* (citing *Grubbs*, 565 F.3d at 192).)

Further, a relaxed Rule 9(b) standard should apply in cases like the present case where the details of alleged fraud are within the defendant's knowledge. (*Id.* at 15 (citing *Thompson*, 125 F.3d at 903).) Under such circumstances, the plaintiff need only plead fraud upon information and belief. (*Id.* (citing *Thompson*, 125 F.3d at 903).) Relator then provides the purportedly missing information that Defendants base their 9(b) argument on, which Relator claims is in Defendant's possession:

> (i) the identities of the staff, as they were employees of the Defendants, (ii) the identities and insurance information of the patients as they were run through an insurance verification system and recorded in medical records held by Defendant, (iii) the length of stay and diagnoses of each patient who spent time at Defendant's facility, and (iv) the timing and discharge information of each patient.

(*Id.*) Therefore, as Relator contends, Relator is not required to plead this information with particularity because the information is in Defendants' possession. (*Id.*)

Additionally, Relator argues that Rule 9(b)'s heightened pleading standard is relaxed when the alleged fraud consisted of numerous acts and extended over a period of time. (*Id.* at 15–16 (citing *U.S. ex rel. Foster v. Bristol-Meyers Squibble Co.*, 587 F. Supp. 2d 805, 821 (E.D. Tex. 2008); *U.S. ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745, 768–69 (S.D. Tex. 2010); *U.S. ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1259 (D.C. Cir. 2004)).) When such is the case, as long as a relator pleads a fraudulent scheme with particularity and is specific as to certain acts conducted under the scheme, the relator may prove fraud upon information and belief. (*Id.* at 16.) Relator alleges that he has done so, and thus, the Rule 9(b) pleading standard should be relaxed. (*Id.*)

Relator asserts that he has met Rule 9(b)'s heightened standard and *Grubbs* by alleging a scheme and providing reliable indicia that lead to a strong inference that claims were actually submitted. (*Id.*) Such reliable indicia include identifying: (1) Gopalam, Dr. Katta, and Zucco as those involved in Apollo's scheme to defraud Medicare; (2) Gopalam and Zucco as deciding on admission and discharge based on coverage and not medical necessity; and (3) November 2015 to January 2017 as the time period to which he knew about the scheme occurring, though he believes the scheme began before November 2015. (*Id.* at 17 (citing *First Amend. Compl.* ¶¶ 1, 4, 8, 10, 11, 22, 49, 50–53, 58, 59, 61–73, 75–77, 81, 82, 84, 93, Doc. 55).)

Relator also contends that he provides sufficient details in relation to the nature of the false claims that were submitted: "fraudulent medical diagnoses that falsely and fraudulently created admissions for Medicare patients, prolonged inpatient hospital stays of Medicare patients, and effectuated discharges of Medicare patients." (*Id.* at 17–18 (citing *First Amend. Compl.* ¶¶ 51, 55, 70–72, Doc. 55).)  He even provided the most common false diagnosis, which is bipolar disorder. (*Id.* at 18 (citing *First Amend. Compl.* ¶ 70, Doc. 55).)  Further, in his *First Amended Complaint*, he provided the average length of stay for patients depending on their insurance coverage. (*Id.* (citing *First Amend. Compl.* ¶ 68, Doc. 55).)

Relator argues that he alleged with specificity how Defendants created false claims, including:

> (1) communicating the fraudulent policies to staff in meetings and in writing, including a copy of a memo drafted by Zucco memorializing the scheme in which Zucco clearly complains about a patient being admitted without any remaining Medicare days ([*First Amend. Compl.* ¶¶ 61–62, Doc. 55]); (2) how and when Gopalam and Zucco arrive at discharge decisions at daily meetings at 8:30 a.m. outside the presence of Dr. Katta ([*First Amend. Compl.* ¶ 69, Doc. 55]); and (3) directing medical staff to actively seek out patients from Apollo's outpatient facility who have Medicare coverage and admit them through similar false diagnoses ([*First Amend. Compl.* ¶ 72, Doc. 55]).

(*Id.*)

He also specified the particular steps Defendants took to conceal their False Claims Act

violations. Such steps include:

> (1) a secret coding system that Gopalam devised and memorialized in an email to
> Zucco, copying Relator, which is reproduced in the [*First Amended Complaint*]
> verbatim ([*First Amend. Compl.* ¶¶ 63–64, Doc. 55]);
> (2) falsifying medical records by making false entries on federally mandated
> records regarding the reasons for not accepting patients from other hospitals,
> including that the patient was violent, that the patient needed treatment for drug
> abuse . . ., or that there were no available beds ([*First Amend. Compl.* ¶ 65, Doc.
> 55]);
> (3) outright destroying federally mandated medical records through a shred bin,
> some of which Relator copied before they were destroyed ([*First Amend.
> Compl.* ¶ 66, Doc. 55]); and
> (4) creating a patient "blacklist" of patients who were not allowed to return because
> they had reached their lifetime maximum of inpatient hospital stays under
> Medicare, a copy of which Relator has in his possession ([*First Amend. Compl.*
> ¶ 67, Doc. 55]).

(*Id.* at 18–19.)

Lastly, Relator also clarifies that his allegations about Apollo's deficiencies that allegedly

violate Medicare's conditions for participation are not the basis for his False Claims Act claims

and are merely for background. (*Id.* at 20.) Further, Defendants' arguments in relation to EMTALA

have no bearing on Relator's claims and are beside the point. (*Id.* at 19.) Whether an EMTALA

violation, standing alone, can form the basis of a false certification claim under the False Claims

Act is an open question. (*Id.* (citing *U.S. ex rel. Vanderlan v. Jackson HMA, LLC*, No. 15-767,

2020 WL 2323077, at *9 (S.D. Miss. May 11, 2020)).) Relator asserts that he is not basing his

false certification claim off of EMTALA. (*Id.*) Rather, he only pointed out Defendants' "EMTALA

violations because they are part of the fraudulent scheme to defraud Medicare and establish

scienter on the part of Defendants." (*Id.*)

31

c.  Defendants' Reply (Doc. 66)

In reply to Relator's *Opposition*, Defendants argue that Relator has not met his burden under Rule 9(b) in respect to his allegations that Defendants made up false diagnoses and submitted medically unnecessary claims. (*Reply*, Doc. 66 at 1.) In asserting so, Relator provided no detail regarding the alleged false diagnoses and submission of medically unnecessary claims, such as documentary evidence, eyewitness accounts, or direct knowledge, what type of treatment was medically unnecessary, why treatment was medically unnecessary regarding a patient's condition, or how many claims were medically unnecessary. (*Id.* at 1–2.) Thus, Relator's First Amended Complaint "completely lacks the particular details of the scheme alleged paired with reliable indicia that would give rise to an inference that false claims were actually submitted." (*Id.* at 2.)

Defendants dispute Relator's argument that "Rule 9(b)'s pleading requirements should be relaxed because: (1) the fraud occurred over an extended period of time and consisted of numerous acts[;] and (2) the facts are 'peculiarly within defendants' knowledge.' " (*Id.* at 3.) Defendants contend that just because events occurred over an extended period of time does not mean that Relator is immune from pleading sufficient details of alleged fraudulent conduct. (*Id.*) Likewise, although it is true that Defendants possess information such as patients' medical records, Relator's allegations are so conclusory in nature that "defendants have no way of knowing which class/types of records, diagnoses, or treatments are alleged false and, thus, have no idea what claims could be involved." (*Id.* at 4.) Also, to determine which claims could be deemed false, Defendants would have to look to other medical records and/or information, since the alleged records in Defendants' possession contain "made up diagnoses." (*Id.*) Such other medical records and/or information would be available to all parties and are not "peculiarly within the defendants' knowledge." (*Id.*) Thus, a relaxed Rule 9(b) standard is unwarranted. (*Id.*)

Defendants assert that predicating admission based on a patient's insurance coverage is not in violation of the False Claims Act. (*Id.*) Defendants have no legal obligation to admit any patients to its facility because the determination that inpatient care is necessary for PEC/CEC patients is made by other physicians and coroners, not Apollo. (*Id.* at 4–5.) Likewise, since the vast majority of Apollo's referrals come from hospital emergency rooms, these patients have already been evaluated and stabilized and were referred to Apollo for further treatment. (*Id.* at 5.) Defendants reassert their argument from their *Motion to Dismiss*, (Doc. 63), that EMTALA applies for emergency care and not to facilities like Apollo where PEC patients had been stabilized prior to their admission. (*Id.*)

Defendants also contend that Relator's allegation of the average length of stay for patients dependent on their insurance coverage is not a probative statistic. (*Id.*) "Medicare provides a higher reimbursement and is less likely to be reduced or discounted upon scrutiny of the claims. This fact alone explains the discrepancy in average length of stay." (*Id.* (internal citations omitted).) Likewise, Relator gives no information that indicates "that the average length of stay for Apollo's Medicare patients is longer than the average length of stay nationally." (*Id.*) Further, the maximum number of days Apollo is authorized to provide treatment for PEC/CEC patients is 15 days; however, the average stay for Medicare patients alleged by Relator is eight days. (*Id.*) "If, as Relator[] allege[s], Apollo sought to maximize profit for Medicare patients, and it intended to fraudulently extend the treatment period for these patients, the average length of stay would be closer to 15 than eight days." (*Id.* at 5–6.)

Lastly, Defendants argue that the fact that Medicare patients are desirable patients to facilities like Apollo is "unremarkable and understandable given the paucity of private insurance coverage for mental health disorders and the financial pressure imposed on inpatient facilities who

accommodate patients with low-paying and no-paying insurance." (*Id.* at 6.) Defendants reject Relator's allegation that Apollo must accept all patients, regardless of ability to pay, if there are open beds. (*Id.*) Under such circumstances inpatient hospitals like Apollo would be forced to close for not being able to meet their expenses. (*Id.*)

### 2. *Applicable Law*

Under 31 U.S.C. § 3729(a)(1)(A), a person will be held liable under the False Claims Act if they "knowingly present[], or cause[] to be presented, a false or fraudulent claim for payment or approval." Thus, liability under 31 U.S.C. § 3729(a)(1)(A) hinges on three elements: presentment, falsity, and knowledge. The law relating to each element will be discussed in turn.

### a. Presentment

Again, under Rule 9(b), "[t]o allege fraud, 'a party must state with particularity the circumstances constituting fraud.' " *U.S. ex rel. Gage v. Davis S.R. Aviation, L.L.C.*, 623 F. App'x 622, 625 (5th Cir. 2015) (quoting Fed. R. Civ. P. 9(b)). " 'Rule 9(b) requires, at a minimum, that a plaintiff set forth the "who, what, when, where, and how" of the alleged fraud.' " *Id.* (quoting *U.S. ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 266 (5th Cir. 2010)); *see also U.S. ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 329 (5th Cir. 2003) ("The time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby must be stated . . .  in order to satisfy Rule 9(b)." (internal quotations and citations omitted)).

But "the 'time, place, contents, and identity' standard is not a straitjacket for Rule 9(b). Rather, the rule is context specific and flexible and must remain so to achieve the remedial purpose of the False Claim Act." *Grubbs*, 565 F.3d at 190. Thus, " 'to plead with particularity the circumstances constituting fraud for a False Claims Act § [3729(a)(1)(A)] claim, a relator's

complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.' " *U.S. ex rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237, 240 (5th Cir. 2020) (quoting *Grubbs*, 565 F.3d at 190).

*Grubbs* gives guidance in determining what level of detail is necessary. For instance, before laying out its holding, the Fifth Circuit stated that "surely a procedural rule [such as Rule 9(b)] ought not be read to insist that a plaintiff plead the level of detail required to prevail at trial." *Grubbs*, 565 F.3d at 189.  As *Grubbs* stated:

> Fraudulent presentment requires proof only of the claim's falsity, not of its exact contents. If at trial a *qui tam* plaintiff proves the existence of a billing scheme and offers particular and reliable indicia that false bills were actually submitted as a result of the scheme—such as dates that services were fraudulently provided or recorded, by whom, and evidence of the department's standard billing procedure—a reasonable jury could infer that more likely than not the defendant presented a false bill to the government, this despite no evidence of the particular contents of the misrepresentation. Of course, the exact dollar amounts fraudulently billed will often surface through discovery and will in most cases be necessary to sufficiently prove actual damages above the Act's civil penalty. Nevertheless, a plaintiff does not necessarily need the exact dollar amounts, billing numbers, or dates to prove to a preponderance that fraudulent bills were actually submitted. To require these details at pleading is one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates.

*Id.* at 189–90 (internal citation omitted).

The Fifth Circuit next rejected the defendants' argument that "because presentment is the conduct that gives rise to [§ 3729(a)(1)(A)] liability, Rule 9(b) demands that it is the contents of the presented bill itself that must be pled with particular detail and not inferred from the circumstances." *Id.* at 190. The appellate court stated:

> We must disagree with the sweep of that assertion. Stating "with particularity the circumstances constituting fraud" does not necessarily and always mean stating the

contents of a bill. The particular circumstances constituting the fraudulent presentment are often harbored in the scheme. A hand in the cookie jar does not itself amount to fraud separate from the fib that the treat has been earned when in fact the chores remain undone. Standing alone, raw bills—even with numbers, dates, and amounts—are not fraud without an underlying scheme to submit the bills for unperformed or unnecessary work. It is the scheme in which particular circumstances constituting fraud may be found that make it highly likely the fraud was consummated through the presentment of false bills.

*Id.*

The *Grubbs* court also discussed how the standard it established "comport[ed] with Rule 9(b)'s objectives of ensuring the complaint 'provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims then attempting to discover unknown wrongs.' " *Id.* (quoting *Melder v. Morris*, 27 F.3d 1097, 1100 (5th Cir. 1994)).  In doing so, the Fifth Circuit said:

Confronting False Claims Act defendants with both an alleged scheme to submit false claims and details leading to a strong inference that those claims were submitted—such as dates and descriptions of recorded, but unprovided, services and a description of the billing system that the records were likely entered into— gives defendants adequate notice of the claims. In many cases, the defendants will be in possession of the most relevant records, such as patients' charts, doctors' notes, and internal billing records, with which to defend on the grounds that alleged falsely-recorded services were not recorded, were not billed for, or were actually provided.

*Id.* at 190–91.

Further, in explaining why the district court erred in concluding that the relator failed to comply with Rule 9(b), the *Grubbs* court found:

The complaint sets out the particular workings of a scheme that was communicated directly to the relator by those perpetrating the fraud. Grubbs describes in detail, including the date, place, and participants, the dinner meeting at which two doctors in his section attempted to bring him into the fold of their on-going fraudulent plot. He alleges his first-hand experience of the scheme unfolding as it related to him, describing how the weekend on-call nursing staff attempted to assist him in recording face-to-face physician visits that had not occurred. Also alleged are specific dates that each doctor falsely claimed to have provided services to patients

and often the type of medical service or its Current Procedural Terminology code that would have been used in the bill.

Taking the allegations of the scheme and the relator's own alleged experience as true, as we must on a motion to dismiss, and considering the complaint's list of dates that specified, unprovided services were recorded amounts to more than probable, nigh likely, circumstantial evidence that the doctors' fraudulent records caused the hospital's billing system in due course to present fraudulent claims to the Government. It would stretch the imagination to infer the inverse; that the defendant doctors go through the charade of meeting with newly hired doctors to describe their fraudulent practice and that they continually record unprovided services only for the scheme to deviate from the regular billing track at the last moment so that the recorded, but unprovided, services never get billed. That fraudulent bills were presented to the Government is the logical conclusion of the particular allegations in Grubbs' complaint even though it does not include exact billing numbers or amounts.

*Id.* at 191–92.

Later, the Fifth Circuit rejected the argument that *Grubbs* absolved relators of Rule 9(b)'s heightened pleading requirements. *See Nunnally*, 519 F. App'x at 893. The appellate court stated:

To the contrary, *Grubbs* reaffirms the importance of Rule 9(b) in FCA claims, while explaining that a relator may demonstrate a strong inference of fraud without necessitating that the relator detail the particular bill. *See* 565 F.3d at 190. We established that a relator could, in some circumstances, satisfy Rule 9(b) by providing factual or statistical evidence to strengthen the inference of fraud beyond mere possibility, without necessarily providing details as to *each* false claim. *Id.* This standard nonetheless requires the relator to provide other reliable indications of fraud and to plead a level of detail that demonstrates that an alleged scheme likely resulted in bills submitted for government payment. *Id.* Significantly, the complaint in *Grubbs* rested on the relator's actual description of a solicitation by two of the defendants to the relator to participate in an elaborate scheme to defraud the government, the particulars of which were there alleged.

*Id.* The Fifth Circuit then agreed with the district court that the relator failed to plead with sufficient particularly under Rule 9(b) and *Grubbs* that the hospital submitted false claims in violation of the False Claims Act:

[Relator] Nunnally's wholly generalized allegations of false claims presented to the Government do not "alleg[e] *particular* details of a scheme" (emphasis added) and are not "paired with reliable indicia that lead to a strong inference that [false] claims were actually submitted." *See Grubbs,* 565 F.3d at 190. We held in *Grubbs* that the

contents of a false claim need not always be presented under this subsection because, given that the Government need not rely on or be damaged by the false claim, "the contents of the bill are less significant." *Id.* at 189. This does not absolve Nunnally of the burden of otherwise sufficiently pleading the time, place, or identity details of the traditional standard, in order to effectuate Rule 9(b)'s function of fair notice and protection from frivolous suits. *See id.* at 190. Nunnally's allegations of a scheme to submit fraudulent claims are entirely conclusory, do not offer factual information with sufficient indicia of reliability, and do not demonstrate a strong inference that the claims were presented to the Government in violation of § 3729(a)(1).

*Id.* at 895. The district court's order dismissing the False Claims Act claims was thus affirmed. *Id.*

b. <u>Falsity</u>

Congress has not yet defined the term "falsity" under the False Claims Act. However, "[i]t is a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses. And the term 'fraudulent' is a paradigmatic example of a statutory term that incorporates the common-law meaning of fraud." *Univ. Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 187 (2016) (internal citations and quotations omitted). The Fifth Circuit recognizes two types of falsity: legal and factual. Factual falsity "involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *U.S. ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F. Supp. 2d 487, 496–97 (S.D. Tex. 2003), *aff'd*, 111 F. App'x 296 (5th Cir. 2004). Legal falsity is "where a party affirmatively certifies compliance with a statute or regulation as a condition to receiving governmental payment or property." *Id.* at 497.

The Supreme Court has recognized two types of legal falsity: implied certification and express certification. *Escobar*, 579 U.S. 176. Express certification occurs when a defendant makes "claims containing express falsehoods." *Id.* at 187. Implied certification is

[w]hen . . . a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements[.] [T]hose omissions can[, pursuant to the implied false certification theory,] be a basis for liability

38

> [under the False Claims Act] if they render the defendant's representations
> misleading with respect to the goods or services provided.

*Id.* Implied certification occurs "where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Id.* at 190.

"Not every breach of a federal contract is an FCA problem. [The Fifth Circuit has] repeatedly upheld the dismissal of false-certification claims (implied or express) when a contractor's compliance with federal statutes, regulations, or contract provisions was not a 'condition' or 'prerequisite' for payment under a contract." *Steury*, 625 F.3d at 268. "[W]hen 'the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation.' " *U.S. ex rel. Marcy v. Rowan Cos.*, 520 F.3d 384, 389 (5th Cir. 2008) (quoting *Thompson*, 125 F.3d at 902). "These 'false certifications of compliance create liability under the FCA when certification is a prerequisite to obtaining a government benefit.' " *Id.* (quoting *Thompson*, 125 F.3d at 902).

### c. Knowledge

The Supreme Court has recognized that the False Claims Act's "scienter requirement defines 'knowing' and 'knowingly' to mean that a person has 'actual knowledge of the information,' 'acts in deliberate ignorance of the truth or falsity of the information,' or 'acts in reckless disregard of the truth or falsity of the information.' " *Escobar*, 579 U.S. at 182 (quoting 31 U.S.C. § 3729(a)(1)(A)). "This is an elevated standard, as a finding of negligence or gross negligence is not sufficient to satisfy the scienter requirement." *U.S. ex rel. Johnson v. Kaner Med. Grp., P.A.*, 641 F. App'x 391, 394 (5th Cir. 2016). "Given this definition of 'knowingly,' courts

have found that the mismanagement—alone—of programs that receive federal dollars is not enough to create FCA liability." *Id.* (quoting *U.S. ex rel. Farmer v. City of Hous.*, 523 F.3d 333, 339 (5th Cir. 2008)) (internal quotations omitted). "Rather, it must be established that the defendant had (1) actual knowledge of falsity, (2) acted with deliberate ignorance of the truth or falsity of the information provided, or (3) acted with reckless disregard of the truth or falsity of the information provided when the Defendant[] fraudulently induced [the government payment.]" *U.S. ex rel. Bias v. Tangipohoa Par. Sch. Bd.*, 86 F. Supp. 3d 535, 538 (E.D. La. 2015) (internal quotations and citations omitted).

### 3. *Analysis*

After careful consideration, the Court finds that Relator has not adequately plead his claim under 31 U.S.C. § 3729(a)(1)(A). Relator clearly alleges knowledge by alleging that he complained to Gopalam about the illegal conduct, and Gopalam assured him that such activity would stop. (*First Amend. Compl*. ¶ 75, Doc. 55.). However, with respect to falsity, the Court finds that Relator has not satisfied Rule 9(b)'s particularity requirement, which will be analyzed below in the context of 31 U.S.C. § 3729(a)(1)(B).

Likewise, the Court finds that Relator has failed to adequately allege presentment. As Defendants note in their *Memo in Support*, Relator's First Amended Complaint fails to identify any specific claim Defendants filed with Medicare nor does it allege a claim that was presented by date, time, place, or service provided. (*See Memo in Support*, Doc. 63-1 at 11.) However, under *Grubbs*, if Relator cannot allege a specific claim presented to Medicare, he can nonetheless allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted," *Grubbs,* 565 F.3d at 190, as long as such allegations are not "sweepingly conclusory . . . [and] devoid of factual details," *Guth*, 2014 WL

40

7274913, at *6. As the Fifth Circuit made clear in *Nunnally*, the *Grubbs* standard of pleading a scheme "does not absolve [a relator] of the burden of otherwise sufficiently pleading the time, place, or identity details of the traditional standard, in order to effectuate Rule 9(b)'s function of fair notice and protection from frivolous suits." *Nunnally*, 519 F. App'x at 895.

Relator clearly alleges that Apollo had a two-part scheme to defraud Medicare. (*First Amend. Compl.* ¶ 55, Doc. 55.) First, "Apollo fraudulently packs its hospital with Medicare patients having benefits remaining, at the exclusion of all other patients. And second, . . . once these Medicare patients are admitted, Apollo and its primary physician commit fraud by routinely and systematically billing Medicare for services that are not medically necessary." (*Id.*)

To allege how Apollo packs its hospital, Relator provided a July 27, 2016, email in which he asserts memorializes Apollo's illegal admissions procedures:

> The following are from past memos but needs to be re-addressed[,] so please sign as acknowledgement and place in my mailbox.
>
> ***
>
> 3) Medicare:
> Check "Lifetime Psychiatric Days", Part A hospital full days, and co-insurance days. Need all three. Melissa S did not have hospital days or co-insurance days.

(*Id.* at ¶ 61.) Further, he provided a June 28, 2016, email in which he alleges memorializes the secrete coding system Gopalam devised for a patient's payer source to be reflected upon admission. (*Id.* at ¶ 61.) In the email, Gopalam explains that Medicare patients should be coded as "MC," Medicare patients with no days left should be coded as "MC0," patients with both Medicare and Medicaid should be coded as "MC/MD," and patients with both Medicare and Medicaid but with no remaining Medicare benefits should be coded as "MC0/MD." (*Id.*) Relator also alleges that Apollo prioritized admitting Medicare beneficiaries that had remaining benefits, (*id.* at ¶ 52), and that once a patient's coverage runs out, regardless of whether that coverage was with Medicare,

Medicaid, self-pay, or unfunded, those patients are "summarily dumped as a matter of routine . . . ." (*Id.* at ¶ 52.) Further, Gopalam and Zucco had meetings every day at 8:30 a.m. to discuss these discharge procedures, (*id.* at ¶ 69), and most notably,

> Zucco maintained a list of patients who exhausted their 190 day lifetime reserve days under Medicare, or otherwise had no insurance coverage, in a Word document called "DNR," for "do not return," meaning these patients were never to be admitted at Apollo. To avoid detection of this obviously illegal practice from CMS inspectors, Zucco instructed Relator to change the name of this document from "DNR" to "VIP." Relator has a copy of this list and an email informing Zucco that he had made the change that she had requested."

(*Id.* at ¶ 67.)

Taking Relator's allegations of the scheme as true, as we must on a motion to dismiss, Relator has not alleged specific facts to satisfy Rule 9(b)'s particularity requirement with respect to Defendants packing Apollo with Medicare patients with remaining benefits because the facts he did allege, although particular, do not relate to a *scheme to submit false claims*. Relator claims that Apollo's admissions practices violate "Medicare regulations," but Relator makes no allegations as to what regulations these practices violate. While Relator does provide a "Statutory Background" section at the beginning of his *First Amended Complaint* where he discusses various Medicare statutes and regulations, (*see id.* at ¶¶ 22–44), the Court does not find that any of these statutes relate to packing a hospital with Medicare patients with remaining benefits being a violation of Medicare. Likewise, as Defendants point out in their *Memo in Support*, throughout Relator's *First Amended Complaint*, he only makes general statements that Defendants' actions have violated Medicare statutes and regulations without providing what Medicare statutes and regulations Defendants have violated. (*Memo in Support*, Doc. 63-1 at 6.) Relator does, however, allege EMTALA violations. But, in Relator's words, "It is an open question whether an EMTALA violation, standing alone, can form the basis of a false certification claim under the FCA."

(*Opposition*, Doc. 65 at 19.) "Relator is not relying upon EMTALA to establish Defendants' false certification. . . . Relator points out the EMTALA violations because they are part of the fraudulent scheme to defraud Medicare and establish scienter on the part of Defendants." (*Id.*)

While the Medicare statutes and regulations in Relator's "Statutory Background" section of his *First Amended Complaint*, namely 42 U.S.C. § 1395f(a)(2)(A), (a)(4) and CMS1500, do relate to actions regarding the second part of the alleged scheme, the Court does not find any that relate to the first part of the scheme. Therefore, while Relator's allegations related to Defendants packing Apollo with Medicare beneficiaries with remaining benefits seem to meet Rule 9(b) particularity requirement, such allegations on their own cannot equate to a "scheme to submit false claims" because Relator has not provided in his complaint how such actions violate Medicare statutes and regulations. Thus, to satisfy 31 U.S.C. § 3729(a)(1)(A)'s presentment requirement, Relator's allegations relating to the second part of Defendants' alleged scheme—that Defendants billed Medicare for medically unnecessary services—must survive *Grubbs* and *Nunnally* for his claim to be viable.

> In regard to the second part of the scheme, Relator clearly alleges that
>
> [f]raudulently prolonging the stays of Medicare patients requires Apollo's medical staff, including Dr. Katta, to routinely make up false diagnoses (one of Dr. Katta's preferred diagnoses for this purpose is bipolar disorder) that require the need for "medical services" that either were not medically necessary or were not even provided at all, along with false information regarding the patients' prognosis and progress. And, of course, both Katta and Apollo both bill Medicare for all of these fraudulent, unnecessary services and inpatient days while falsely certifying to the government that they were in compliance with all Medicare laws and regulations, that the bills were true, accurate and complete, and that the services were medically necessary and complete.

(*First Amend. Compl.* ¶ 70, Doc. 55.) Having carefully considered the matter, the Court finds that such allegations fall short of *Grubbs*. In *Grubbs*, the Fifth Circuit based its decision on "the allegations of the scheme[;] . . . the relator's own alleged experience[;] . . . and . . . the complaint's

list of dates that specified, unprovided services were recorded[.]" *Grubbs*, 565 F.3d at 192.  The Fifth Circuit also stated that the "complaint set[] out the particular workings of a scheme that was communicated directly to the relator by those perpetrating the fraud"; "describe[d] in detail, including the date, place, and participants, the dinner meeting at which two doctors in his section attempted to bring him into the fold of their on-going fraudulent plot"; and "allege[d] his first-hand experience of the scheme unfolding as it related to him, describing how the weekend on-call nursing staff attempted to assist him in recording face-to-face physician visits that had not occurred"; and pled "specific dates that each doctor falsely claimed to have provided services to patients and often the type of medical service or its Current Procedural Terminology code that would have been used in the bill." *Id.* at 191–92. Such allegations are not present in relation to part two of the alleged scheme.

All Relator has alleged in his *First Amended Complaint* is that Dr. Katta would make up false diagnoses, provide medical services that were unnecessary, not provide needed medical services, and provide false information regarding patients' prognoses and progress. (*First Amend. Compl.* ¶ 70, Doc. 55.) The most detail Relator gives is that Dr. Katta's preferred false diagnosis was bipolar disorder. (*Id.*) Without anything more, Relator fails to satisfy Rule 9(b), as his *First Amended Complaint* "contain[s] sweepingly conclusory allegations that are devoid of factual details" in regard to the second part of Defendants' alleged scheme to bill Medicare for medically unnecessary services. *Guth*, 2014 WL 7274913, at *6.

Therefore, the Court grants Defendants' motion as it pertains to Relator's 31 U.S.C. § 3729(a)(1)(A) claim.

### B.  31 U.S.C. § 3729(a)(1)(B) Claim

#### 1.  *Parties' Arguments*

##### a.  Defendants' Memo in Support (Doc. 63-1)

Defendants explain that a person is in violation of 31 U.S.C. § 3729(a)(1)(B) when he or she "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." (*Memo in Support*, Doc. 63-1 at 16–17 (citing 31 U.S.C. § 3729(a)(1)(B)).) Further, "[t]he false records provision 'requires [] that the defendant made a false record or statement for the purpose of getting a false or fraudulent claim paid by the Government.' " (*Id.* at 17 (*Grubbs*, 565 F.3d at 193) (second alteration in original.) "General allegations of a 'written and/or implied certification to the Medicare program that it was in compliance with all of the Medicare's program rules' are not sufficient." (*Id.* (citing *Nunnally*, 519 F. App'x at 895).) Thus, a complaint will not meet Rule 9(b)'s heightened standard if it does not make particular allegations and point to specific facts relating to a false record or statement. (*Id.*)

Defendants argue that Relator does not plead facts to support a false records claim other than the fact that Apollo used false diagnoses to bill for services that were either never provided or medically unnecessary. (*Id.*) However, such allegations fail to discuss specifics about the alleged records and notes pertaining to these false diagnoses. (*Id.*) "The Amended Complaint contains no details of when these alleged medical records were created, who submitted them, and for what patient or services they were submitted." (*Id.*)  Likewise, "Relator does not provide one specific allegation of a patient or claim related to a false diagnosis or unprovided services." (*Id.*)

Defendants claim that Relator's allegations that Defendants committed "other violations" of Medicare's conditions of participation and/or payment are insufficient because Relator did not "allege which conditions of participation and/or payment were breached with this conduct, which

claims were affected by the alleged non-compliance, or how such non-compliance was material to the government's decision to pay the claims . . . ." (*Id.* at 23.) Defendants assert that materiality is required to find liability under the False Claims Act and that the Act "is not a means of imposing treble damages and other penalties for insignificant regulatory or contractual violations." (*Id.* at 24 (citing *Escobar*, 579 U.S. at 194).)  Since Relator has not plead any facts as to materiality, his claims as to Defendants' violations of Medicare's conditions of participation and/or payment are without merit under the False Claims Act. (*Id.*)

### b.  Relator's Opposition (Doc. 65)

Relator argues that Apollo's fraudulent acts are both legally and factually false and are, as a result, in violation of the False Claims Act. (*Opposition*, Doc. 65 at 10.) False Claims Act claims can be based on either legal falsities or factual falsities, and both types of falsities trigger False Claims Act liability. (*Id.* at 5 (citing *U.S. ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp 2d 745, 765–66 (S.D. Tex. 2010 (citing *Graves*, 284 F. Supp. 2d at 497)).) If a claim involves claims for government reimbursement for items or services never provided, the case is factually false. (*Id.* (citing *U.S. ex rel. Wall v. Vista Hospice Care, Inc.*, 778 F. Supp. 2d 709 (N.D. Tex. 2011)).) If a claim violates a statute, regulation, or contract and, thus, fails to satisfy an underlying legal requirement, the case is legally false. (*Id.* (citing *Wall*, 778 F. Supp. 2d 709).)

Defendants' scheme involved factual falsities "because Defendants bill Medicare for services that are not medically necessary and/or not actually provided." (*Id.* at 10.) Thus, "in essence, Defendants are submitting false claims for payment to Medicare for providing 'patients' with room and board with very little, if any, actual psychiatric services, which is 'purely custodial and thus not covered under Medicare.' " (*Id.* (citing 42 C.F.R. § 424.14(a)).)

Defendants' scheme involved legal falsities as well. Specifically, "Defendants falsely certify to the government that they are in compliance with all Medicare laws and regulations, that their bills are true, accurate and complete, and that the services were medically necessary." (*Id.*) Defendants' false certifications go beyond the CMS Claim Form certifications by also falsely certifying the express conditions for payment set forth in the statutes and regulations specific to psychiatric hospitals (*Id.* at 10–11 (citing 42 U.S.C. § 1395f(a); 42 C.F.R. §§ 424.14, 424(a)(4), 412.3).) Relator argues that "[t]hese certifications are clearly material because the applicable statute expressly references the fact that certifications regarding medical necessity are a required condition for payment; otherwise, without medical necessity[,] the services are 'purely custodial and thus not covered under Medicare.' " (*Id.* at 11 (citing 42 C.F.R. § 424.14).)

Relator asserts that he adequately pled scienter in several ways. (*Id.*) First, Defendants knowingly made and submitted false claims. (*Id.* (citing *First Amend. Compl.* ¶¶ 88, 90, Doc. 55).) Second, Gopalam and Zucco admitted patients based on insurance coverage and not necessity, and such illegal practices were communicated to the staff at Apollo. (*Opposition*, Doc. 65 at 11 (citing *First Amend. Compl.* ¶¶ 4, 50, 52, 58, 61–62, 68, 69, 71, Doc. 55).) Lastly, Defendants covered up their fraud in many ways, including falsifying and destroying medical records, using secret coding systems to designate what insurance patients had, and a patient "blacklist" for patients with no remaining lifetime coverage. (*Id.* (citing *First Amend. Compl.* ¶¶ 63–67, Doc. 55).)

Relator cites to the Fifth Circuit's decision in *Riley* to support the notion that by creating fake diagnoses, not providing services, and providing unnecessary services, Defendants made false statements in violation of the False Claims Act. (*Id.*) In *Riley*, the Fifth Circuit found that falsity under the False Claims Act was adequately pled when "the complaint stated generally that patients were unnecessarily admitted and that Defendants knew of, directed, and personally participated in

47

the fraudulent conduct." (*Id.* (citing *Riley*, 355 F.3d at 376).) Relator asserts that he clearly alleged how Defendants would prolong stays, falsely and fraudulently create admissions, discharge Medicare patients through false diagnoses, and take steps to conceal the fraudulent scheme. (*Id.* (citing *First Amend. Compl.* ¶¶ 51, 55, 63–67, 70–72, Doc. 55).)

### c.   Defendants' Reply (Doc. 66)

Defendants assert that much of the basis of Relator's allegations that Defendants made up false diagnoses and submitted medically unnecessary claims is based on the fact that " 'the vast majority of [Apollo's] patients' were referred from hospital emergency departments, usually as the result of a [PEC]." (*Reply*, Doc. 66 at 2 (citing *First Amend. Compl.* ¶¶ 56–57, Doc. 55) (first alteration in original).) Defendants argue that such allegations are unfounded by the legal framework of PECs, as well as Coroners' Emergency Certificates ("CECs") because "the determination that the patient is dangerous and/or disabled and requires inpatient hospitalization is made by other physicians over whom Defendants have no influence or control (the referring hospital emergency room, then the Coroner)." (*Id.* at 3.)

Defendants also raise the argument that Relator's allegations that Defendants made up false diagnoses and submitted medically unnecessary claims are implausible. (*Id.*) The defendants that filed this *Motion to Dismiss* are Gopalam and Apollo. Apollo does not have a psychiatrist on staff. (*Id.*) Dr. Katta is a sole practitioner, and his "diagnoses and treatment directives are done in his role as a contract psychiatrist, not an employee of Apollo." (*Id.*) Thus, Defendants, Gopalam and Apollo, could not make up false diagnoses and submit medically unnecessary claims because of the lack of an employment relationship between Dr. Katta and Apollo. (*Id.*)

### 2. *Applicable Law*

Under 31 U.S.C. § 3729(a)(1)(B), a person will be held liable under the False Claims Act if that person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). Thus, liability under 31 U.S.C. § 3729(a)(1)(B) will hinge on three elements: knowledge, falsity, and materiality. The law regarding knowledge and falsity with respect to § 3729(a)(1)(B) is the same for § 3729(a)(1)(A). Therefore, only a discussion of the law of materiality is necessary.

"Material" under the False Claims Act is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). In discussing the Act's materiality requirements, the Supreme Court in *University Health Services v. U.S. ex rel. Escobar* explained the following:

> A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or insubstantial.

*Escobar*, 579 U.S. at 182.

The Fifth Circuit in *United States ex rel. Patel v. Catholic Health Initiatives* discussed *Escobar*'s materiality requirement in the context of 31 U.S.C. § 3729(a)(1)(B):

> A violation is not material just because "the defendant knows that the Government would be entitled to refuse payment were it aware of the violation." In other words, "the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." To use the Court's example, just because the government might require contractors to use American-made staplers does not mean that it would be a *material* misrepresentation under the FCA to knowingly use foreign-made ones.
>
> Under the *Escobar* standard, proof of materiality might include "evidence that the defendant knows that the Government consistently refuses to pay claims" involving the type of misrepresentation at issue. But, crucially, "if the Government regularly

pays a particular type of claim despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material."

*U.S. ex rel. Patel v. Cath. Health Initiatives*, 792 F. App'x 296, 301 (2019) (quoting *Escobar*, 579 U.S. 176) (internal citations omitted). In *Patel*, the relators alleged that a hospital violated 31 U.S.C. § 3729(a)(1)(B) by making false statements about its ownership. *Id.* at 300. In finding that such statements were immaterial, the Fifth Circuit held the following:

> As the district court correctly stated, "the Supreme Court understands materiality to turn on whether the government would pay the claim or not if it knew of the claimant's violation." *Patel II*, 312 F. Supp. 3d at 605. "Nothing in Relators' filings suggests that the government would stop the flow of funds to this hospital if it knew the truth of its ownership; Relators' allegations concern only the direction in which they think the funds should flow." *Id.* Relators do not allege that the government "consistently refuses to pay claims" that contain an incorrect statement concerning the ownership of a hospital. *See Escobar*, 136 S. Ct. at 2003. Instead, the complaint specifies that the System has continued to submit claims and receive reimbursement, even after a court determined that the entity designated as owner of the Hospital was not really the owner. This suggests that the government does not care who the "rightful" owner of the Hospital is, and Relators have not alleged facts to the contrary. Importantly, nothing about the alleged misrepresentation here suggests that goods or services were falsely certified or improperly provided.

*Id.* at 301.

### 3.  Analysis

After careful consideration, the Court finds that Relator has not adequately plead his 31 U.S.C. § 3729(a)(1)(B) claim. Again, Relator clearly alleges knowledge by alleging that he complained to Gopalam about the illegal conduct, and Gopalam assured him that such activity would stop. (*First Amend. Compl.* ¶ 75, Doc. 55.) However, with respect to falsity, the Court finds that Relator has not satisfied Rule 9(b)'s particularity requirement. Relator alleges that Apollo's acts and omissions are factually and legally false:

> They are factually false because Apollo and its psychiatrist bill Medicare for services that are not medically necessary and/or not actually provided. They are legally false because Apollo and Dr. Katta falsely certify to the government that

they are in compliance with all Medicare laws and regulations, that their bills are true, accurate and complete, and that the services were medically necessary and complete. In addition, Apollo also violates the AKS by paying remuneration to Dr. Katta, in the form of referring a large number of Medicare patients to him, in order to induce Dr. Katta to go along with Apollo's fraudulent scheme by falsely extending the hospitalization of Medicare patients at Apollo and certifying Apollo's admissions, treatment, and discharge of its patients.

(*First Amend. Compl*. ¶ 53, Doc. 55.) Similarly, Relator also alleges:

Fraudulently prolonging the stays of Medicare patients requires Apollo's medical staff, including Dr. Katta, to routinely make up false diagnoses (one of Dr. Katta's preferred diagnoses for this purpose is bipolar disorder) that require the need for "medical services" that either were not medically necessary or were not even provided at all, along with false information regarding the patients' prognosis and progress. And, of course, both Katta and Apollo both bill Medicare for all of these fraudulent, unnecessary services and inpatient days while falsely certifying to the government that they were in compliance with all Medicare laws and regulations, that the bills were true, accurate and complete, and that the services were medically necessary and complete.

(*Id.* ¶ 70.)

Such allegations are conclusory, not particular. Again, the Fifth Circuit " 'appl[ies] Rule 9(b) to fraud complaints with bite and without apology.' " *Porter*, 810 F. App'x at 240 (quoting *Grubbs*, 565 F.3d at 185). " 'Rule 9(b) requires, at a minimum, that a plaintiff set forth the "who, what, when, where, and how" of the alleged fraud.' " *Gage*, 625 F. App'x at 623.

Although Relator argues that Rule 9(b)'s pleading requirement should be relaxed in cases where facts "relating to the alleged fraud are peculiarly within the defendant's knowledge," (*Opposition*, Doc. 65 at 15 (citing *Thompson*, 125 F.3d at 903)), the Fifth Circuit has "warned that this exception must not be mistaken for license to base claims of fraud on speculation and conclusory allegations. . . . Even where allegations are based on information and belief, the complaint must set forth a factual basis for such belief." *Thompson*, 125 F.3d at 903 (internal

quotations and citations omitted).[4] Relator's allegations of falsity can be contrasted with those in

*Grubbs*, which the Fifth Circuit found survived Rule 9(b):

> [The] complaint particularly alleges that at the February 5 dinner, Drs. Groves and Kanneganti explained how they meet with the nursing staff and "write notes" about patients that they only see on an as needed basis but bill as daily face-to-face visits. He also alleges that two days later the nursing staff "attempted to assist him in recording information as physician visits even before and without his actually personally seeing the patients." Similarly, the complaint alleges that "[o]n December 4 and 5, 2004, Dr. Bagri recorded false progress notes in The Hospital medical records for hospital visits with a patient, but the visits did not actually occur." These are simple, concise, and particular allegations of the circumstances constituting § [3729(a)(1)(B)] fraud and these claims against Drs. Groves, Kanneganti, and Bagri should not have been dismissed at the pleading stage.

*Grubbs*, 565 F.3d at 193. Unlike in *Grubbs*, Relator did not plead the who, what, when, where,

and how as to falsity. Relator comes close by alleging that Dr. Katta's preferred misdiagnosis is

bipolar disorder and that Defendants' fraudulent practices occurred while and before Relator was

employed at Apollo, but these facts alone are insufficient to satisfy Rule 9(b). Perhaps, if Relator

pled a more specific date range or a particular date as to when Dr. Katta fraudulently diagnosed

patients with bipolar disorder, just as the relator in *Grubbs* did by providing dates as to when Dr.

Bagri recorded false progress notes, then Relator would have pled a sufficiently particular

allegation. Further, such a fact is not peculiarly within the Defendants' knowledge. Rather, as a

nurse for Apollo, Relator would be privy to knowing what patients Dr. Katta misdiagnosed or

provided services to that were medically unnecessary and when (at least generally) such activity

---

[4] *See also* § 1298 Pleading Fraud With Particularity—Extent of Requirement, 5A Fed. Prac. & Proc. Civ. § 1298 (4th ed.):

> Allegations of the circumstances of a fraud based on information and belief, which are commonplace and often a necessity in many litigation contexts, usually do not satisfy the particularity requirement of Rule 9(b), unless accompanied by a statement of the facts upon which the pleader's belief is founded or by allegations that the necessary information lies within the defendant's control. Thus, Rule 9(b)'s fraud pleading requirement should not be understood to require absolute particularity as to matters peculiarly within the opposing party's knowledge that the pleader is not privy to at the time of the pleading and that can only be developed through discovery.

took place. The relator in *Grubbs* provided this level of particularity, but Relator in the present case does not.

Relator also argues that fraud can be pled upon information and belief under Rule 9(b) when the fraud occurred over an extended period of time, "so long as the relator pleads the fraudulent scheme with particularity and provides representative examples of specific fraudulent acts conducted pursuant to that scheme." (*Opposition*, Doc. 65 at 15 (citing *Foster*, 587 F. Supp. 2d at 821).) The Court does not find merit in Relator's argument. First, as explained, Relator has not pled the second part of the alleged two-part scheme with particularity. Second, Relator's allegations as to the first part of Defendant's alleged scheme, although detailed, do not allege a scheme to submit a false claim because Relator has not alleged any Medicare statutes or regulations that such a scheme, if carried out, would violate. Thus, such allegations, even though alleged with specificity, cannot satisfy 31 U.S.C. § 3729(a)(1)(B)'s materiality requirement because they are not "material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

Therefore, the Court will grant Defendant's motion with respect to Relator's 31 U.S.C. § 3729(a)(1)(B) claim.

### C.  31 U.S.C. § 3729(a)(1)(C) Claim

Defendants contend that to establish a conspiracy claim under 31 U.S.C. § 3729(a)(1)(C), Relator must show: "(1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by [the Government] and (2) at least one act performed in furtherance of that agreement." (Doc. 63-1 at 17–18 (citing *Farmer*, 523 F.3d at 343).) Further, to be in violation of 31 U.S.C. § 3729(a)(1)(C)'s conspiracy provision, Defendants must be in violation of one of the other six provisions of 31 U.S.C. § 3729(a)(1). (*Id.* (citing *Guth*, 2014 WL 7274913, at *8).) Defendants assert that since Relator has not plead an adequate claim under 31

U.S.C. § 3729(a)(1)(A) or 31 U.S.C. § 3729(a)(1)(B), Relator's conspiracy claim under 31 U.S.C. § 3729(a)(1)(C) inherently must fail.

The Court finds merit in Defendants' argument. Under 31 U.S.C. § 3729(a)(1)(C), any person who conspires to commit a violation under 31 U.S.C. § 3729(a)(1)(A) or 31 U.S.C. § 3729(a)(1)(B) is subject to civil liability under the False Claims Act. 31 U.S.C. § 3729(a)(1)(C). "A conspiracy-based FCA claim require[s] proof of (1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim and (2) at least one act performed in furtherance of that agreement. *U.S. ex rel. Bias v. Tangipahoa Par. Sch. Bd.*, 86 F. Supp. 3d 535, 538–39 (citing *Farmer*, 523 F.3d at 343).

Since the Court finds that Relator has failed to adequately allege his 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1)(B) claims, Relator, inherently, has not alleged a viable claim under 31 U.S.C. § 3729(a)(1)(C) claim.  Therefore, the Court will grant Defendant's motion with respect to Relator's 31 U.S.C. § 3729(a)(1)(C) claim.

### D.  Retaliation Claim

#### 1.  *Parties' Arguments*

##### a.  Defendants' Memo in Support (Doc. 63-1)

Defendants maintain that even if the alleged conduct concerning Relator is true, it does not equate to a False Claims Act violation, and, thus, there can be no retaliation against Relator. (*Memo in Support*, Doc. 63-1 at 7.) They go on to contend that there are three elements to a retaliation claim under the False Claims Act: "(1) the employee engaged in activity protected under the statute; (2) the employer knew that the employee engaged in protected activity; and (3) the employer discriminated against the employee because he engaged in protected activity." (*Id.* at 22

(citing *U.S. ex rel. Wuestenhoefer v. Jefferson*, 105 F. Supp. 3d 641, 675 (N.D. Miss. 2015) (citing *U.S. ex rel. George v. Bos. Sci. Corp.*, 864 F. Supp. 2d 597, 603–04 (S.D. Tex. 2012))).)

Defendants assert that Relator's allegations fail as to the knowledge element. (*Id.*) They argue that the knowledge that the Plaintiff is engaged in protected activity in the context of a False Claims Act case means that an employer knew that the Plaintiff's activity could reasonably lead to a False Claims Act case. (*Id.* (citing *Wuestenhoefer*, 105 F. Supp. 3d at 676).) Therefore, "Relator must show that (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." (*Id.* (citing *U.S. ex rel. Byrd v. Acadia Healthcare Co., Inc.*, No. 18-312, 2021 WL 1081121 (M.D. La. Mar. 18, 2023)).)

Defendants argue that although Relator generally alleges the illegal conduct he reported, such allegations are insufficient to show that Defendants violated the False Claims Act. (*Id.* at 22–23.) Therefore, "even if Relator had voiced the allegedly [illegal] conduct to the Defendants, . . . the employer could reasonably have believed, based on the state of EMTALA and Medicare regulations, that the complained-of conduct was not activity that reasonably could lead to a violation under the FCA." (*Id.* at 23.) Thus, Relator has not plead a viable retaliation claim under the False Claims Act. (*Id.*)

b.  Relator's Opposition (Doc. 65)

Relator contends that his *First Amended Complaint* clearly alleges a claim for retaliation under the False Claims Act. (*Opposition*, Doc. 65 at 20.) He provides that the following are the elements of a retaliation claim: "(1) the employee 'engaged in protected activity[;]' (2) the 'employer, or the entity with which he has contracted or serves as an agent, knew about the protected activity[;]' and (3) 'retaliat[ion] . . . because of his protected activity.' " (*Id.* at 21 (citing

*King*, 871 F.3d at 332).) Relator alleges that by orally reporting the suspected violations on numerous occasions, he engaged in protected activity. (*Id.* (citing *First Amend. Compl.* ¶¶ 75–77, Doc. 55).) Further, he was told that the illegal practices would stop, but they did not, and Relator was terminated. (*Id.* (citing *First Amend. Compl.* ¶¶ 75–77, Doc. 55).) Gopalam and Apollo attempted to have Relator's nursing license revoked, and Relator suffered in many ways because of such acts. (*Id.* (citing *First Amend. Compl.* ¶¶ 77–79, Doc. 55).) Taken as true, Relator believes he has adequately pled a retaliation claim under the False Claims Act. (*Id.*)

### c.  Defendants' Reply (Doc. 66)

Defendants contend that since Relator failed to plead sufficient allegations that Defendants submitted false claims to the government, he cannot succeed in his retaliation claim under the False Claims Acts. (*Reply*, Doc. 66 at 6.) Relator bases his claims on Defendants illegally considering insurance coverage when admitting patients. (*Id.*) However, such action does not run afoul of any statute or regulation. (*Id.*) Given that "Relator must show that his or her actions were aimed at matters that 'reasonably could lead to a viable claim' under the [False Claims Act,]" Relator's retaliation claim must fail because the illegal conduct he alleges occurred while he engaged in the protected activity of reporting is based on legally unfounded claims. (*Id.*)

### 2.  *Applicable Law*

"Under the False Claims Act's anti-retaliation provision:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter."

*Wuestenhoefer*, 105 F. Supp. 3d at 675 (quoting 31 U.S.C. § 3730(h)(1)). "There are three elements to a claim of retaliation under the Act: '(1) the employee engaged in activity protected under the statute; (2) the employer knew that the employee engaged in protected activity; and (3) the employer discriminated against the employee because she engaged in protected activity.' " *Id.* (quoting *George*, 864 F. Supp. 2d at 604 (collecting cases)).

" 'A protected activity is one motivated by a concern regarding fraud against the government.' " *Id.* at 675–76 (quoting *McCollum v. Jacobs Eng'g Grp., Inc.*, 992 F. Supp. 2d 680, 688 (S.D. Miss. 2014) (quoting *Thomas v. ITT Educ. Servs., Inc.*, 517 F. App'x 259, 262 (5th Cir. 2013))). " 'To engage in protected activity under the Act, an employee need not have filed a lawsuit or have developed a winning claim at the time of the alleged retaliation. Instead, an employee's actions must be aimed at matters that reasonably could lead to a viable claim under the Act.' " *Id.* at 676 (quoting *George*, 864 F. Supp. 2d at 604–05 (internal citations omitted) (collecting cases)). "Stated another way, the actions must relate to 'matters demonstrating a "distinct possibility" of False Claims Act litigation.' " *Id.* (quoting *George*, 864 F. Supp. 2d at 605). "This standard is satisfied when '(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government.' " *Id.* (quoting *George*, 864 F. Supp. 2d at 605).

"The 'kind of knowledge the defendant must have mirrors the kind of activity in which the plaintiff must be engaged. What defendant must know is that Plaintiff is engaged in protected activity as defined [in the first element]—that is, in activity that reasonably could lead to a False Claims Act case.' " *Id.* (quoting *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 742 (D.C. Cir. 1998)). "At the second stage, it is sufficient to show knowledge of a supervisor." *Id.* at 676–

77 (citing *United States v. Columbia Healthcare Corp.*, No. H–98–861, 2005 WL 1924187, at *17 (S.D. Tex. Aug. 10, 2005) (citing *Yesudian*, 153 F.3d at 742)).

To satisfy the last element (causation), a relator need only make a prima facie showing. *See George*, 864 F. Supp. 2d at 609–11.  A "prima facie case requires only that [Relator] demonstrate a 'causal connection' between his protected activity and his firing, even if he must ultimately demonstrate but-for causation at the pretext stage of the *McDonnell Douglas* framework" for a motion for summary judgment. *Garcia v. Prof'l Contract Servs.*, *Inc.*, 938 F.3d 236, 241 (5th Cir. 2019).  "At the prima facie case, a plaintiff can meet his burden of causation simply by showing close enough timing between his protected activity and his adverse employment action." *Id.* at 243.

### 3. Analysis

Having carefully considered the matter, the Court finds that Relator satisfies the Rule 8 requirement for a retaliation claim under the False Claims Act. Defendants argue that since Relator's allegations are insufficient to show that Defendants' conduct violated the false claims act, Defendants did not have knowledge that the complained-of activity could have led to a False Claims Act violation because of "the state of EMTALA and Medicare regulations." (*Memo in Support*, 63-1 at 22–23.) Such an argument is circular. Essentially, Defendants argue that if a Relator has not met his burden of pleading a False Claims Act claim under 31 U.S.C. § 3729(a)(1)(A)–(C), he cannot succeed in a retaliation claim because, since Relator has not adequately pled a violation, Defendants could not have known that Relator's activity would lead to a False Claims Act violation.

The Court disagrees with Defendants' analysis.  Again, "What defendant must know is that Plaintiff is engaged in protected activity . . . —that is, in activity that reasonably could lead to a False Claims Act case." *Wuestenhoefer*, 105 F. Supp. 3d at 676. Relator alleges that on numerous

occasions he orally reported the suspected False Claims Act violations to Gopalam and Zucco and was told that such illegal practices would stop. (*First Amend. Compl.* ¶¶ 75–77, Doc. 55.) In orally reporting these violations, Relator clearly engaged in protected activity because his "actions [were] aimed at matters that reasonably could lead to a viable claim under the Act." *Wuestenhoefer*, 105 F. Supp. 3d at 676. Construing Relator's allegations in a light most favorable to him, he in good faith believed, and a reasonable employee in his position might believe, that Defendants were committing fraud against the government. (*First Amend. Compl.* ¶¶ 75–77, Doc. 55.) Further, Relator adequately pled that Gopalam and Zucco knew about the protected activity by stating that he reported the alleged fraud to them, and they assured him that the fraud would stop. Thus, Relator has adequately pled under Rule 8 that he engaged in protected activity and that Defendants knew that such protected activity could reasonably lead to a False Claims Act case.

Therefore, Defendants' motion is denied with respect to Relator's retaliation claim.

## IV.   LEAVE TO AMEND

Relator requests that in the event that this Court finds he has not sufficiently alleged the elements of any of his claims under the False Claims Act that this Court allow him to amend his *First Amended Complaint* as an alternative to dismissal. (*Opposition*, Doc. 65 at 21–22.)

"[A] court ordinarily should not dismiss the complaint except after affording every opportunity to the plaintiff to state a claim upon which relief might be granted." *Byrd v. Bates*, 220 F.2d 480, 482 (5th Cir. 1955). The Fifth Circuit has further stated:

> In view of the consequences of dismissal on the complaint alone, and the pull to decide cases on the merits rather than on the sufficiency of pleadings, district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).

One leading treatise has further explained:

> As the numerous case[s] . . . make clear, dismissal under Rule 12(b)(6) generally is not with prejudice—meaning, not immediately final or on the merits—because the district court normally will give the plaintiff leave to file an amended complaint to see if the shortcomings of the original document can be corrected. The federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that the plaintiff be given every opportunity to cure a formal defect in the pleading. This is true even when the district judge doubts that the plaintiff will be able to overcome the shortcomings in the initial pleading. Thus, the cases make it clear that leave to amend the complaint should be refused if there is no basis for concluding that the plaintiff can state a claim and thus permitting an amendment would be futile. A district court's refusal to allow leave to amend is reviewed for abuse of discretion by the court of appeals. A wise judicial practice would be to allow at least one amendment regardless of how unpromising the initial pleading appears because it usually is unlikely that the district court will be able to determine conclusively on the face of a defective pleading whether the plaintiff actually can state a claim for relief.

5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2023) (footnotes omitted).

In short, the Court will grant Relator leave to amend. Although he has amended his complaint once, he has not done so in response to a ruling by this Court assessing the sufficiency of his claims. Thus, "the Court will act in accordance with the 'wise judicial practice' and general rule and grant Plaintiff's request." *JMCB, LLC v. Bd. Of Com. and Indus.*, 336 F. Supp. 3d 620, 642 (M.D. La. 2018); *see also Fetty v. La. State Bd. of Private Sec. Exam'rs*, 611 F. Supp. 3d 230, 250 (M.D. La. 2020) (deGravelles, J.) ("[B]ecause Plaintiffs did not amend their complaint in response to a ruling by this Court, and because of the above 'wise judicial practice,' the Court will grant Plaintiffs one final opportunity to amend their complaint to state viable claims against the Board Members." (citing *JMCB*, 336 F. Supp. 3d at 641–42)); *Murphy v. Bos. Sci. Corp.*, No. 18-31, 2018 WL 6046178, at *1 (M.D. La. Nov. 19, 2018) (deGravelles, J.) (reaching same result) (citing, *inter alia*, *JMCB*).

60

However, the Court reminds both parties of the need for judicial economy and their obligations under Federal Rule of Civil Procedure 11. Specifically, by signing the pleading, Relator's attorneys are "certify[ying] that to the best of [their] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: . . .

> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

Fed. R. Civ. P. 11(b)(2), (3).  Similarly, Defendants are under a duty to have a good faith basis for legal arguments. In sum, given the age and complexity of this case, and given the Court's caseload (both generally and since the COVID-19 pandemic began), both parties are encouraged to act in a way to maximize judicial economy and conserve party, attorney, and judicial resources.

## V.   CONCLUSION

Accordingly,

**IT IS ORDERED** that *Renewed Rule 12(b)(6) Motion to Dismiss*, (Doc. 63), filed by Defendants Gopinath Gopalam and Apollo Behavioral Health Hospital, LLC, is **GRANTED IN PART** and **DENIED IN PART.**  The motion is **DENIED** as to Relator's retaliation claim. In all other respects, the motion is **GRANTED**, and all other False Claims Act claims are **DISMISSED WITHOUT PREJUDICE.**  Relator shall be given twenty-eight (28) days in which to amend his complaint to cure the above deficiencies.  Failure to do so will result in the dismissal of these claims with prejudice.

Signed in Baton Rouge, Louisiana, on September 29, 2023.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**